## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION - DAYTON

| | | |
|---|---|---|
| BRYAN A. MOBLEY, | : | CASE NO.  3:13-cv-00102 |
| Plaintiff, | : | Judge  Timothy S. Black |
| | | Magistrate Michael R. Merz |
| v. | : | |
| | : | **DEFENDANT MIAMI VALLEY** |
| MIAMI VALLEY HOSPITAL, INC., | | **HOSPITAL'S MOTION FOR** |
| | : | **SUMMARY JUDGMENT** |
| Defendant. | | |

_____

Now comes the Defendant, Miami Valley Hospital, Inc., by and through counsel, and hereby moves this Court pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment on the Plaintiff's claims for relief, as outlined in the accompanying memorandum, the basis of which includes the pleadings, deposition transcripts, and exhibits, on the grounds that reasonable minds construing the evidence as favorably as possible to Plaintiff could only come to one conclusion: the Plaintiff's termination from his employment did not result from disability discrimination or FMLA retaliation.

Respectfully submitted,

 _/s/ Gretchen M. Treherne_
John F. Haviland (0029599), Trial Attorney
Gretchen M. Treherne (0074376)
BIESER, GREER & LANDIS LLP
400 PNC Center; 6 North Main Street
Dayton, Ohio 45402-1908
Telephone: (937) 223-3277
Facsimile: (937) 223-6339
E-mail: jfh@bgllaw.com; gmt@bgllaw.com
*Attorneys for Defendant, Miami Valley Hospital*

# M E M O R A N D U M

## I.    BACKGROUND

### A.    Introduction

The Plaintiff, Bryan Mobley, filed a Complaint against Miami Valley Hospital ("MVH")
on March 20, 2013, alleging three causes of action: (1) disability discrimination under the
Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112(a); (2) state law disability
discrimination under Ohio Revised Code § 4112.02, et seq.; and (3) FMLA retaliation.
(Complaint, Doc #3).[1]

### B.    Statement of Uncontroverted Facts

#### 1.    Plaintiff's Employment as a Housekeeper at MVH

Plaintiff Bryan Mobley was employed by MVH since 2006 as an attendant in the
Environmental Services department. (Answer, Doc. # 4, PAGEID #26, ¶ 6). Joseph Zippilli was
Mobley's direct supervisor; Michael Benton was the manager to whom Zippilli reported and
Danny Smith, Jr. was the Director of the department.  (Deposition of Danny Smith, Jr., "Smith
Depo.," at 10, 14).   Employees who are hired as an attendant or technician (aka housekeeper) in
the Environmental Services department are all certified to do all housekeeping tasks.
(Deposition of Joseph Zippilli, "Zippilli Depo." at 126).  While there are different housekeeping
positions within the department, all housekeepers have the same primary job description and are
expected to be able to perform all positions within the department.  (Smith Depo. at 16-17)  The
managers in the environmental services department had the discretion to move employees within
the department around in order to meet the hospital's operational needs.  (Zippilli Depo. at 108-
109; Smith Depo. at 42, 45; Deposition of Bernita Ricks, "Ricks Depo." at 57).

---

[1] The Complaint was originally filed in the Montgomery County Common Pleas Court.  It was removed to this
Court on April 4, 2013.

Mobley's regular shift was second shift.  (Deposition of Bryan Mobley, "Mobley Depo."
at 13).  When Mobley first began working at MVH, he was assigned to the medical imagining
department.  (Mobley Depo. at 12-13 ; Ricks Depo. at 22).  He was later assigned to clean
surgery suites in the OR, which he did for several years.  (Mobley Depo. at 13; Deposition of
Michael Benton, "Benton Depo." at 14, 17).   While Mobley's performance cleaning surgical
suites in the OR was satisfactory for quite a while, in 2011, Mobley's supervisors began fielding
numerous complaints about him from other employees at MVH. (Zippilli Depo. at 74-75; Benton
Depo. at 14; Smith Depo. at 36-37; Mobley Depo. at Ex. F, G, H, I, J, L; Plaintiff Exhibits, "Pl.
Ex.,"[2] 69, 70).   Mobley had a "deteriorating attitude over time."  (Zippilli Depo. at 139).

## 2.    Plaintiff's Conflicts with Other MVH Employees

In May 2011, Mobley's supervisors received complaints about Mobley's "erratic
behavior" and "a noticeable change in his demeanor."  (Pl. Ex. 69).   Mobley also became
confrontational in his interactions with certain coworkers.  (Zippilli Depo. at 129-130, 136;
Mobley Depo. at Ex. F, G, H, I, J, L).  For example, in April 2011, several members of the
surgical staff claimed that there were "continuous" and "ongoing problem(s)" with Mobley on
the weekend shift, including rudeness, "refusing to help clean rooms when we are busy," and
"instigating problems with staff."  (Mobley Depo. at Ex. F, G).  These surgical staff members
requested that Mobley be moved to another area.  (Id.)   In September 2011, a MVH cafeteria
employee complained to Mobley's supervisors about Mobley's "rudeness," "harassment," and
"demeaning attitude toward cafeteria personnel."  (Mobley Depo. at Ex. J).  On November 1,
2011, Mobley had a verbal altercation with a Patient Care Assistant ("PCA") in the OR, where
the PCA claimed that Mobley "got in my face and threatened me and I feared for my safety."

---

[2] The Plaintiff Exhibits were utilized by the Plaintiff in the depositions of Joseph Zippilli, Michael Benton, Danny
Smith, and Bernita Ricks.  Instead of numbering separate exhibits for each deposition of MVH representatives, the
exhibits were grouped together and sequentially numbered.

(Mobley Depo. at Ex. I).  Mobley was "coached" on numerous occasions about these issues.

(Zippilli Depo. at 77; Benton Depo. at 25).   In response to the complaints about Mobley, his

supervisors began considering moving him to another position within the environmental services

department. (Pl. Ex. 69; Benton Depo. at 20, 28).

### 3.      Plaintiff's Assignment to the "Patient Trash 2" Position

When a "Patient Trash 2" position became available, Mobley's supervisors transferred

him to that position.  The transfer took effect on February 6, 2012.  The Patient Trash 2 position

required that Mobley remove trash from patient rooms located on the fourth and sixth floors of

the hospital.  (Zippilli Depo. at 148-149).   The job duties of emptying patient trash were not new

to Mobley; as a housekeeper, he had previously been trained on how to empty patient trash.

(Zippilli Depo. at 105-106).  According to Zippilli, the reason Mobley was selected to be moved

to the Patient Trash 2 position was as follows:

> For his welfare, I wanted to put him in a populated area that would take advantage
> of his interpersonal skills and – reduce the volume of work that he had to do in the
> ORs, the terminal cleaning aspect and the lounge and the other things he had to do
> and put him into an     area where he would benefit because of his ability to relate
> with patients and other – other clerical members and then – give me an
> opportunity to put someone else into the OR area to take care of the surgery side.

(Zippilli Depo. at 117).  Zippilli saw the transfer as "an opportunity for me to do what I thought

would help Bryan."  (Id. at 118).

When assigned to the Patient Trash 2 position, Mobley indicated he understood the job

duties.  (Zippilli Depo. at 178).  From the time Mobley began the position, he consistently failed

to complete his job duties each day.  He usually only emptied the trash in 25% of the rooms of

which he was required to service.    (Zippilli Depo. at 159; Mobley Depo. at Ex. N; Pl. Ex.17-19,

21-34).  MVH had conducted a time study on all jobs throughout the hospital.  (Zippilli Depo. at

149).  The study was based on national standards. (Benton Depo. at 59).  As a result of the study,

an average of two minutes was budgeted for emptying the trash in each patient room. (Id. at 149). Because Mobley never completed his job assignment for the day, other MVH housekeeping employees had to pick up the slack. (Zippilli Depo at 187- 189; Plaintiff's Ex. 40). Mobley's supervisors met with him on several occasions to discuss the issues with his failure to complete his job duties. (Pl. Ex. 39, 41, 43, 50, 51, 53). Zippilli believed that Mobley's performance issues in the Patient Trash 2 position resulted from a deliberate lack of effort on Mobley's part. (Zippilli Depo. at 119; Benton Depo. at 57). There was never a time that Mobley's supervisors thought Mobley did not have the ability to do the job. (Zippilli Depo. at 158-159; Benton Depo. at 31). While Mobley complained that the job was "too much" work, other employees had no problems completing the job tasks each day. (Zippilli Depo. at 159; Benton Depo. at 58-59). Mobley indicated he did not want to do the job and simply refused to do anything beyond emptying trash cans on the sixth floor. (Zippilli Depo. at 160).

### 4. Disciplinary Action Against Plaintiff

On February 14, 2012, Mobley received a mandatory (per MVH policy) Step Three Corrective Action (written warning) for a no-call, no-show. (Pl. Ex. 63). While Mobley received subsequent retroactive FMLA approval for the day off, he did not call his supervisor or follow the correct call-in procedures for his department, in violation of MVH's policy. (Mobley Depo. at 116, 126; Zippilli Depo. at 252-253; Pl. Ex. 64). After the Step 3 written warning, Mobley continued to fail to complete his job duties.

On February 17, 2012, Mobley's supervisors placed Mobley on a developmental plan, with a warning that he would be subject to discipline if he did not demonstrate any progress. (Zippilli Depo at 185; Mobley Depo. at 140; Pl. Ex. 39). On February 22, 2012, Mobley had a meeting with Zippilli, Benton, and Smith to discuss his performance issues. (Zippilli Depo. at

190; Plaintiff's Exhibit 41). At that meeting, it was agreed that the developmental plan would be extended. (Pl. Ex. 41, 44). Mobley was placed on a revised developmental plan on February 29, 2012. (Pl. Ex. 29). The revised plan clarified some of Mobley's job duties. (Id.; Zippilli Depo. at 209). Mobley did not make any progress under the plan, so on March 2, 2012, Mobley received a Step Four Corrective Action (Final Written Warning). (Pl. Ex. 54). Mobley was assigned a trainer (Kenny) to demonstrate for Mobley techniques to effectively complete the job duties in the time allotted. (Zippilli Depo. at 225-226, 229). The reason for assigning the trainer was to "extend every opportunity for Bryan to be successful in this role." (Zippilli Depo. at 229; *see also*, Benton Depo. at 51). Mobley decided he did not need the trainer's assistance. (Zippilli Depo. at 231; Benton Depo. at 60; Pl. Ex. 55-56). Thereafter, Mobley continued to fail to perform his job duties. He received a Step Five Corrective Action (Discharge) for poor job performance on March 8, 2012, resulting in his termination from MVH. (Pl. Ex. 60).

Mobley has acknowledged, that pursuant to MVH policy, a dischargeable offense includes "failure to comply with the reasonable request or assignment made by a supervisor, including changes in work area, work schedule, or work duties." (Mobley Depo. at 81, Ex. M). Mobley also acknowledged that "continued poor work performance" can result in termination. (Mobley Depo. at 120, Ex. D at 52). Mobley filed a disability discrimination charge with the Ohio Civil Rights Commission, which determined by Letter of Determination dated January 10, 2013, that there was no probable cause to issue an administrative complaint accusing MVH of an unlawful discriminatory practice.

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no

genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.ö  Federal Rule of Civil Procedure 56(c).  In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party.  <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 157 (1970).

To prevail, the movant must establish that there are no genuine issues of material fact. This task may be accomplished by demonstrating that the non-moving party lacks evidence to support an essential element of her case.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986); <u>Barnhart v. Pickrel, Schaeffer & Ebeling Co.</u>, 12 F.3d 1382, 1388-89 (6th Cir. 1993).  In response, the non-moving party must present õsignificant probative evidenceö to show that there more than some metaphysical doubt as to the material facts.ö  <u>Moore v. Philip Morris Cos.</u>, 8 F.3d 335, 339-40 (6th Cir. 1993).  The non-moving party õmay not rest upon its mere allegations. . . but . . . must set forth specific facts showing that there is a genuine issue for trial.ö  Federal Rule of Civil Procedure 56(e); <u>See also</u>, <u>Celotex Corp.</u>, 477 U.S. at 324; <u>Searcy v. City of Dayton</u>, 38 F.3d 282, 286 (6th Cir. 1994).  Finally, the mere existence of scintilla of evidence in support of a non-moving partyøs position will not be sufficient; there must be evidence on which the jury can reasonably find for the non-moving party.  <u>Anderson v. Liberty Lobbying, Inc.</u>, 477 U.S. 242, 251 (1986); <u>Copeland v. Machulis</u>, 57 F.3d 476, 479 (6th Cir. 1995).

Here, the only facts material to this Courtøs disposition of the Plaintifføs claims are not in dispute.  Accordingly, the instant case represents exactly the type of dispute for which the summary judgment procedure was created to decide in a summary manner ó reasonable minds can only come to the conclusion that the Plaintiff cannot meet the essential elements of proving his disability discrimination claims or his FMLA retaliation claim.

### III.    LAW AND ARGUMENT

**A.    Reasonable Minds Could Only Conclude That the Plaintiff Was Not Discriminated Against on the Basis of His Disability**

Mobley alleges that MVH discriminated against him on the basis of his disability.  His disability claims are brought under both the ADA and O.R.C. § 4112.02.  Because Ohio courts generally follow federal law in analyzing disability discrimination claims, the claims should be treated as one for purpose of analysis.  Garcia v. Whirlpool Corp., Case NO. 3:08-CV-09244, 200 U.S. Dist. LXIS 118409, *9 (N.D. Ohio Nov. 5, 2010) (citing Plant v. Morton Intern., Inc., 212 F.3d 929, 938-39 (6th Cir. 2000) and Columbus Civil Serv. Commœn v. McClone, 82 Ohio St.3d 573 (1998)).

The ADA prohibits discrimination õagainst a qualified individual on the basis of disability in regard to the . . . hiring, advancement, or discharge of employees . . . and other terms, conditions, and privileges of employment.ö 42 U.S.C. § 12112(a).  The Act defines a õqualified individual with a disabilityö as an õindividual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.ö  Id. at § 12111(8). A person is õdisabledö under the ADA if he has õ(A) a physical or mental impairment that substantially limits one or more major life activities . . . ; (B) a record of such an impairment; or (C) [is] regarded as having such an impairment.  Id. at § 12102(1).  Discrimination under the Act extends to the failure to make reasonable accommodations to otherwise qualified individuals with disabilities.  Id. at § 12112(b)(5)(A).

**1.    The Plaintiff Was Not Disabled Within the Meaning of the ADA**

*a.    Mr. Mobley admitted he was not disabled.*

In his deposition, Mobley stated that he was not disabled.  (Mobley Depo. at 144).  This alone, should end the discussion and warrant summary judgment in favor of MVH on Mobley's disability discrimination claim.    If the inquiry is to go further, however, the undisputed evidence indicates that Mobley was not "disabled" within the meaning of the ADA.

*b.    The Plaintiff was not substantially limited in or more major life activities.*

The determination of whether a person is disabled is an individualized inquiry, particular to the facts of each case.  <u>Sutton v. United Air Lines</u>, 527 U.S. 471, 483, 119 S. Ct. 2139 (1999).  Mobley's complaint alleges that he has "significant, permanent mental and physical disabilities" as a result of a stroke that he suffered in 1989.  (Compl., Doc #3, at ¶ 4, Page ID #20).  Mobley testified in his deposition, however, that he had never seen the Complaint before.  (Mobley Depo. at 75).  When Mobley applied for the job at MVH in 2006, 17 years after his stroke, he was subject to a physical exam where it was noted that he could fulfill the essential functions of the job with no restrictions.  (Mobley Depo. at 22, Ex. B).    He continued to work at MVH for over five years without claiming he was disabled and without the need for any accommodations.

After first denying that he was disabled, the following exchange took place in Mobley's deposition:

Q:    What is your disability?
        MR. WEBBER: Objection.  Go ahead and answer.[3]
A:    THE WITNESS: My disability is – it's kind of hard for me to explain.  Wait a minute – I didn't mean to say that.  Wait a minute.  I probably need to breathe – can I get –
Q:    Do you mind answering my question and then we'll take a break.
A:    Yes, that'll be fine.

---

[3]  In a case in which the Plaintiff's primary claim is disability discrimination, it certainly is not objectionable to ask the Plaintiff what his disability is.

> Q:     And --- the question is simply what is your disability?
> A:     My disability is impairment of a speech impediment, headaches. Itøs hard for
>        me to understand certain things.  You up and have to repeat certain things
>        back to me, you know, sometime.  My short term memory.

(Mobley Depo. at 179).

An impairment, standing alone, does not necessarily constitute a disability as defined by the ADA.  Dutcher v. Ingalls Shipbuilding, 53 F.3d 723, 726 (5th Cir. 1995).  Rather, the statute requires õan impairment that substantially limits one or more of the major life activities.ö  Id.  Regulations enacted by the Department of Health and Human Services define õmajor life activitiesö as õfunctions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.ö  29 C.F.R. § 1630.2(1) (1993).  Mobley has not presented any evidence that he was unable to take care of the normal activities of daily living.   In fact, when first asked what his disability was he stated it was õhard for me to explain.ö  (Mobley Depo. at 179). Although he has a speech impediment, Mobleyøs supervisor testified that Mobleyøs speech impediment did not make him difficult to understand or affect Mobleyøs ability to communicate effectively.  (Zippilli Depo. at 38, 41).  The speech impediment did not substantially limit Mobilityøs ability to speak, did not substantially limit his ability to communicate with others, and did not affect his ability to perform his job.  (Mobley Depo. at 179). See, e.g., McKenzie v. Target Stores, C.A. No. 3:95-2787-23, (D. S.C. June 24, 1998), 1998 US. Dist. LEXIS 10687 (plaintifføs speech impediment resulting from cerebral palsy did not prevent her from communicating effectively and was insufficient to classify her as having a substantially limiting impairment).   Similarly, Mobley has provided no credible evidence that his headaches and short term memory substantially limited his major life activities while he was employed at MVH.   With regard to the activity of working, the regulations provide the following guidance:

> Substantially limits means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.

29 C.F.R. § 1630.2(j)(3)(I). "An impairment that affects only a narrow range of jobs can be regarded either as not reaching a major life activity or as not substantially limiting one." Dutcher, 53 F.3d at 727 (quoting Jasany v. United States Postal Service, 755 F.2d 1244, 1249 n.3 (6th Cir. 1985).

Mobley is not substantially limited in the life activity of work. This is evidenced by the fact that he was able to successfully work for many years at MVH. Nothing in his physical condition changed. Additionally, nothing in his job description changed. The only thing that changed was his assignment to a position that he did not like. Mobley cannot show that he is significantly restricted in either a class of jobs or a broad range of jobs in various classes. The fact he claims he is unable to meet the specific demands of a specific position does not mean he is substantially limited from performing a class of jobs or a broad range of jobs in various classes. Therefore, Mobley does not meet the definition of a "disabled" person under the Act.

### c. *The Plaintiff was not regarded by MVH as being disabled*

Mobley's supervisor, Joseph Zippilli, did not regard Mobley as being disabled or a "special needs person." (Zippilli Depo. at 56, 57, 58). MVH's human resources representative also did not consider Mobley to be disabled. (Ricks Depo. at 37). Zippilli also did not think that Mobley has a "lifetime medical condition." (Zippilli Depo. at 59). Upon Mobley's assignment to the Patient Trash 2 position Mobley's neurologist issued a letter stating that the change in Mobley's work assignment would not affect him. (Mobley Depo. at Ex. O). It was not until after Mobley was transferred to the Patient Trash 2 position and after he received his

first Step 3 written warning that Zippilli, Benton, and Smith became aware, through a note from

Dr. Martin, that Mobley suffered from migraines, hypertension, and a seizure disorder.  (Zippilli

Depo. at 180; Benton at 63; Smith Depo. at 64).   Zippilli did not believe that Mobley was

physically restricted from performing his job duties.  (Zippilli Depo. at 219).

In order to qualify for accommodations based on a disability, Mobley was required to

have his disability documented and determined through MVH's third party administrator,

CIGNA.  (Zippilli Depo. at 25-26; Benton Depo. at 66-67, 73; Ricks Depo. at 13, 36).  CIGNA

would then provide information to MVH about Plaintiff's need for an accommodation.  (Zippilli

Depo. at 26; Ricks Depo. at 43). Mobley was informed that he needed to contact HR and CIGNA

to certify his disability and request an accommodation (Zippilli Depo. at 203; Benton Depo. at

66-67, 76; Ricks Depo. at 15, 38-39, 45; Pl. Ex. 46).   A doctor's note alone was not enough to

certify a disability; with over 300 employees in the environmental services department, doctor's

notes were received all the time.  (Zippilli at 203).[4]  That is why there was a process that needed

to be followed in order to document a disability. (Id. at 207; *see also, generally*, Ricks Depo. at

36-46, 65).   In this case, Mobley did not request certification of his disability or

accommodations through CIGNA.   Under the circumstances, Mobley was not regarded as

disabled by MVH.

## 2. The Plaintiff Did Not Request a Reasonable Accommodation

Even if it were assumed that Mobley was disabled for purposes of the ADA (which MVH

denies), Mobley's disability discrimination claim still fails.

Mobley's disability discrimination claim appears to be premised on a failure to

accommodate.   To establish a *prima facie* case of failure to accommodate under the ADA, a

---

[4] Even if a doctor's notice were sufficient to establish a disability, the doctor's note submitted by Mobley was insuffieint because it did not contain any information about Mobley's purported disability or how such disability affected his ability to perform his job functions.  (Zippilli Depo. at 182, 220-221; Benton Depo. at 64-65, 72-73).

plaintiff must show that: (1) he is disabled within the meaning of the Act; (2) he is otherwise qualified for the position, with or without reasonable accommodation; (3) his employer knew or had reason to know about his disability; (4) he requested an accommodation; and (5) the employer failed to provide the necessary accommodation." Myers v. Cuyahoga County, Ohio, 182 Fed. Appx. 510, 515 (6th Cir. 2006) (citing DeCarlo v. Potter, 358 F.3d 408, 419 (6th Cir. 2004)). "Under the ADA, requests for accommodation must be linked to a disability." Estades-Negroni v. Assocs. Corp. of N. Am. , 377 F.3d 58, 64 (6th Cir. 2004). "An employer need not provide accommodations where it does not know that an employee has a disability. " Id.

After the prima facie case is made, the burden shifts to the employer to prove that "the challenged job criterion is essential" or that the "proposed accommodation will impose an undue hardship upon the employer." Kleiber v. Honda of Am, Mfg., Inc., 485 F.3d 862, 869. "Before the burden shifts to the employer to show an undue burden, the plaintiff must propose an accommodation that is objectively reasonable to employers in general." Kempter v. Mich. Bell. Tel. Co., 534 Fed. Appx. 487 (6th Cir. 2013), citing Walsh v. United Parcel Svc., 201 F.3d 718, 726 n.3 (6th Cir. 2000). Employees do not have a right to demand a particular accommodation. Hankins v. The Gap, Inc., 84 F.3d 797, 800-01 (6th Cir. 1996).

### a.    *The Plaintiff Was Not a Qualified Individual*

In his deposition, Mobley acknowledged that the essential functions of the job included removing trash from patient rooms on the Sixth Floor South SSU, Sixth Floor Advanced Care, Fourth Floor, Pods A, B. C and D, as well as the fourth floor ICU, the sitting area, vending area, eating area, restrooms, reception, telephone area, and sitting area on the fourth floor. (Mobley Depo. at 87-90). He acknowledged that he was only able to complete 25% of the essential job functions.  (Mobley Depo. at 87-91, 138-141, Exhibit N). An admission by a plaintiff that he

cannot perform an essential function of his job without accommodation õnegates the qualified individual elementö of an ADA claim.ö <u>Cole v. Taber</u>, 587 F. Supp.2d 856, 864. (W.D. Tenn. 2008). As explained by the Sixth Circuit:

> If a claimant cannot show that she can perform the essential functions of a given position with or without an accommodation, she is not a õqualified individual with a disabilityø within the meaning of 42 U.S.C. § 12111(8), and accordingly fails to make out a prima facie case of discrimination. The ADA does not demand that an employer exempt a disabled employee from an essential function of the job as an accommodation. What [Plaintiff] requests is not an accommodation, but rather an exemption and, as such, does not survive the threshold determination of whether she is a õqualified individual with a disability.ö

> <u>Brickers v. Cleveland Bd. of Ed.</u>, 1445 F.3d 846, 850 (6th Cir. 1998) (internal citations

omitted). Mobley was unable to show that he could perform the essential functions of the job, and therefore, he is not a õqualified individual.ö

### b. The Plaintiff Did Not Request a Reasonable Accommodation

Because Mobley is unable to establish that he is disabled within the meaning of the ADA and is additionally unable to establish that he is a õqualified individualö under the ADA, he is unable to make a prima facie case for disability discrimination. He is further unable to make a prima facie case because he did not request a reasonable accommodation.

Mobley admits he never requested *any* accommodation, much less a reasonable one. (Mobley Depo. at 180 -181). For this reason alone, Mobleyøs disability discrimination claim should fail. In particular, Mobley stated the following in his deposition:

> Q:    Did you request from your supervisors or anyone from Miami Valley Hospital an accommodation of your disability?
> A:    Well, I didnøt -- I need no special attention or anything like that. No.

(Mobley Depo. at 180).

He confirmed this fact again:

> Q:      . . .Mr. Mobley, did you make any requests for an accommodation of your
> disability to your employer?
> A:      Now is there any way you can put that in another way to me?
> Q:      We were talking about the fact that you had a disability and you stated that your
> supervisor knew you had a disability and that disability was chronic headaches
> and a seizure disorder.
> And my question was did you make any request to your supervisor or anyone at
> Miami Valley Hospital to accommodate that disability?
> A:      No.  I didn't  -- have to have no special needs or anything like that for him to
> make special accommodations, you know, for my disability, you know, anything
> like that, you know, like I was the pet P or anything like that, no.

(Mobley Depo. at 180-181).

Mobley's admission that he did not have any needs that required an accommodation

and that he never requested any accommodation is fatal to his disability discrimination claim.

Nevertheless, assuming *arguendo* that Mobley contradicts his testimony about his failure to

request a reasonable accommodation and instead argues that a note from Dr. Vandersluis

requesting "light duty" was, in fact, a request for accommodation, or that Mobley's request to be

returned to his position cleaning surgical suites was also a request for accommodation, neither of

these requests were reasonable.

### (1)      Light Duty Is Not a Reasonable Accommodation

On February 23, 2012 (one day after Mobley's meeting with his supervisors to discuss

his performance issues), Mobley's neurologist, Dr. Vandersluis issued a letter stating that

Mobley should be placed on "light duty".  (Pl. Ex. 42) Dr. Vandersluis then withdrew his

recommendation that Mobley be placed on "light duty" four days later.  (Pl. Ex. 47).   Therefore,

to the extent that Mobley argues this was a request for accommodation, this request was

withdrawn.    Moreover, "light duty" is not considered a reasonable accommodation.   See

Kempter, 534 Fed. Appx. At 492; Hoskins v. Oakland Cnty. Sheriff's Dept., 227 F.3d 719, 730

(6th Cir. 2000).   The ADA does not require altered or reduced production standards or

designation of lighter work load.    Hankins v. The Gap, Inc., 84 F.3d 797, 800-01 (6th Cir. 1996).  *See also*, Milton v. Scrivener, Inc. , 53 F.3d 1118, 1123-24 (10th Cir. 1995) (altered or reduced production standards or designation of lighter workload was not a "reasonable accommodation" for employees who were unable, due to their alleged disabilities, to meet employer's new production standards; employer was not required to reallocate job duties, altering essential function of job, where such accommodation would have required other workers to work harder or longer hours, etc.).

MVH did not permit employees to work "light duty," with one exception: employees who were given "light duty" positions under the workers compensation program. (Zippilli Depo. at 27, 31, 196; Benton Depo. at 70, 75; Smith Depo. at 34; Ricks Depo. at 61).   Mobley did not suffer an injury that qualified for workers compensation.  Thus, "light duty" was not available to him.  Presumably, a request for "light duty" was a request to reduce Mobley's workload by 75%.  Such a proposal is glaringly unreasonable.   Its unreasonableness is evidenced further by the fact that no other MVH employees in the Patient Trash 2 position had difficulty completing the job responsibilities and the parameters for the position were set by national standards.

### (2)    Return to Prior Assignment is Not a Reasonable Accommodation

Mobley's request to be re-assigned to cleaning surgical suites was not a request for a reasonable accommodation. It is the position of the environmental services department that all housekeepers should be able to perform all functions within the housekeeping department. (Zippilli Depo. at 126, 191, 219).  Therefore, Mobley's request to be returned to his former position was not a reasonable request and was not an indication that he was able to perform the essential functions of his job.   Returning Mobley to the OR-1 position would not meet the operational needs of the department (Zippilli Depo. at 231-232; Benton Depo. at 98).

Additionally, Mobley was removed from his position cleaning surgical suites because he was experiencing increasing conflicts with the surgical staff in the OR. (Benton Depo. at 20-21, 34). Having him return to the position of cleaning OR suites would not have alleviated this issue. Thus, returning Mobley to the OR-1 position would have resulted in a hardship to MVH in having to address the continuing conflicts encountered by Mobley.   Such an accommodation was not a reasonable one under the circumstances.

Moreover, Mobley had performance issues in the Patient Trash 2 position.  He was given multiple opportunities to meet the performance objectives, but chose not to do so.  (Zippilli Depo. at 234).  Moving Mobley back to the OR position would be rewarding him for not doing his job.  (Id.)

**B.** **Reasonable Minds Could Only Conclude That the Plaintiff Was Not Retaliated Against for Exercising his Rights under the FMLA.**

Under the FMLA, "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period  . . .[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(10(1)(D).  An employee is not limited to "block leave" but may be permitted to take the leave intermittently.  See 29 U.S.C. § 2612(b)(1).  The Act prohibits an employer from interfering with, restraining, or denying an employee's exercise of, or attempt to exercise, his or her rights under the FMLA. 29 U.S.C. § 2615(1)(1).   To make a *prima facie* case of FMLA retaliation, a plaintiff must show that (1) he was engaged in a protected FMLA activity; (2) the employer knew he was exercising his rights under the Act; (3) after learning of the employee's exercise of his FMLA rights, the employer took adverse employment action against him; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action.  Donald v. Sybra, Inc., 667 F.3d 757, 761 (6th Cir. 1012) (quoting Killian v. Yorozu Auto.

Tenn., Inc., 454 F.3d 549, 556 (6th Cir. 2006)). If the plaintiff establishes a prima facie case for

FMLA retaliation, the burden shifts to the employer to show a legitimate, nondiscriminatory

reason for discharging the employee. Edgar v. JAC Products, Inc., 433 F.3d 501, 507 (6th Cir.

2006). If the employer offers a legitimate reason for termination, the plaintiff must show that the

reason was actually a "pretext to mask discrimination." Skrjanc v. Great Lakes Power Serv. Co.,

272 F.3d 309, 315 (6th Cir. 2001).

      Even if an absence is entitled to FMLA protection, a no call/no show associated with

such an absence is a separate issue. See Greer v. Cleveland Clinic Health Sys –E. Region, 503

Fed. Appx. 422, 429 (6th Cir. 2012). Holding an employee accountable for his violations of the

employer's attendance policy does not result in a FMLA violation. Id. See also, Allen v. Butler

County Comm'r, 331 Fed. Appx. 389 (6th Cir. 2009), (holding that an employee's discharge for

violating the company's sick leave policy by not calling into work did not violate the employee's

rights under the FMLA).

      On February 14, 2012, Mobley received a mandatory (per MVH policy) Step Three

Corrective Action (written warning) for a no-call, no-show. (Pl. Ex. 63). MVH's Attendance

Policy requires employees to call their supervisor if they need to take the day off. (Mobley

Depo. at Ex. D, 369). MVH's FMLA policy also requires both CIGNA, MVH's third party

administrator, and the employee's supervisor to be notified when the employee takes FMLA

leave. (Pl. Ex. 66). In particular, the FMLA policy states in pertinent part:

> Requesting FML – **The employee is to notify her/his supervisor of the impending leave.** The employee is then required to our third party administrator at 1-888-842-4462 to begin the FML process. FML leave requests will be managed by our third party administrator. Employees are responsible for providing information to the third party administrator in a timely manner. Failure to provide information is a timely manner in accordance with the law which requires pre-notification of FML leave as soon as practicable may result in delay of FML approval or denial of FML. **Notification to both the supervisor and the**

**third party administrator is required.**  The FML must be requested at least two (2) days from the date the employee returns from FML absence.

(Pl. Ex. 66; Mobley Depo. at Ex. Q). (Emphasis added).

Mobley was approved for intermittent FMLA leave (Pl. Ex. 79-80).  CIGNA's FMLA policies also required Mobley to notify his supervisor by stating the following:

You are required to contact your department manager, each time you will be absent from work as it pertains to this leave for FML purposes and make every reasonable effort to provide notification for an absence in advance, as soon as practicable, depending on your individual circumstances.  You must also schedule your absence so that it does not unduly disrupt the employer's operations, subject to the approval of the Health Care Provider.

***

If your need for absence is unforeseeable, you must follow the company's normal call-in procedures.  If you fail to follow normal call-in procedures, except under extenuating circumstances, you may be subject to standard company disciplinary rules . . .

(Mobley Depo. at 114-116; Ex. R).   Thus, if he was going to exercise an intermittent leave day, Mobley was required to notify his supervisor or follow MVH's call-in procedures.  (Id.)

Mobley admitted he did not call his supervisor on February 14, 2012 to inform him that he was taking the day off.  (Mobley Depo. at 126; Pl. Ex. 64)  Moreover, a check with the secretary of the environmental services department, a check of the department's voicemail, and consultation with other members of the department confirmed that Mobley did not contact anyone in the department to indicate he would not be at work that day.  (Zippilli Depo. at 252-253; Ricks Depo. at 91-92).   The fact that CIGNA retroactively approved the day as an FMLA day does not negate the no-call, no-show infraction.  (Zippilli Depo. at 259; Benton Depo. at 91; Ricks Depo. at 88; Pl. Ex. 65).

Under MVH's Attendance Standards, a no-call, no-show infraction is considered a performance issue and automatically results in a Step 3 Corrective Action.  (Zippilli Depo. at 264; Ricks Depo. at 94-95; Mobley Depo. at Ex. D). This rule is set forth in MVH's Employee

Manual. (See Mobley Depo. at Ex. D, 39).   Therefore, the issuance of the Step 3 Corrective

Action was in compliance with MVH's policy.  It does not constitute an FMLA violation.

## IV.   CONCLUSION

Even when viewing the matter in a light most favorable to the Plaintiff, the inevitable

conclusion is favorable to Defendant Miami Valley Hospital and entitles it to judgment as a

matter of law.  The undisputed evidence establishes that: (1) the Plaintiff was not "disabled"

within the meaning of the ADA; (2) the Plaintiff was not a "qualified individual" under the

ADA; and (3) the Plaintiff did not request reasonable accommodations.    Therefore, the

Plaintiff's disability discrimination claim must fail.   The undisputed evidence also establishes

that the Plaintiff was not retaliated against in violation of the FMLA.    The Plaintiff was

terminated for failing to properly perform the essential functions of his job. MVH had a

legitimate and non-discriminatory reason for terminating Mobley's employment.

For all of the foregoing reasons, the Defendant, Miami Valley Hospital, respectfully

requests that this court grant summary judgment in its favor.  The Complaint should be dismissed

with prejudice to any further claims

Respectfully submitted,


 */s/ Gretchen M. Treherne*
John F. Haviland (0029599), Trial Attorney
Gretchen M. Treherne (0074376)
BIESER, GREER & LANDIS LLP
400 PNC Center
 6 North Main Street
Dayton, Ohio 45402-1908
Telephone: (937) 223-3277
Facsimile: (937) 223-6339
E-mail: jfh@bgllaw.com; gmt@bgllaw.com
*Attorneys for Defendant, Miami Valley Hospital*

## CERTIFICATE OF SERVICE

I hereby certify that on March 17, 2014, the foregoing Motion for Summary Judgment was served via-email upon the following:

Adam R. Webber, Esq.
FALKE & DUNPHY, LLC
30 Wyoming Street
Dayton, Ohio 45409
Telephone: 937-222-3000
Facsimile: 937-222-1414
E-mail: webber@ohiolawyers.cc
*Attorneys for Plaintiff*

BIESER, GREER & LANDIS LLP

By  */s/ Gretchen M. Treherne*
    Gretchen M. Treherne (0074376)

440.213075/430045