**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON**

| | | |
|---|---|---|
| **BRYAN A. MOBLEY,** | : | CASE NO:  3:13-cv-00102 |
| **Plaintiff,** | : | District Judge Timothy J. Black |
| | | Magistrate Judge Michael R. Merz |
| **vs.** | : | |
| **MIAMI VALLEY HOSPITAL, INC.,** | : | **PLAINTIFF'S MEMORANDUM IN** |
| | | **OPPOSITION TO MIAMI VALLEY** |
| **Defendant.** | : | **HOSPITAL'S MOTION FOR** |
| | | **SUMMARY JUDGMENT (Doc. No. 19).** |

Plaintiff Bryan Mobley hereby responds to Defendant Miami Valley Hospital's Motion for Summary Judgment (Doc No. 19).  Summary judgment is not warranted.

This lawsuit contains three distinct causes of action related to Mobley's employment at and eventual termination from Miami Valley Hospital ("MVH").  To wit:

(1)    MVH regarded Mobley as having an impairment and demoted him to a less-desirable and more difficult position because of his disability;

(2)    Mobley requested reasonable accommodations from MVH—accommodations that were ignored and rejected;  and

(3)    MVH failed to engage in the "interactive process" with Mobley.

Each of these are distinct, actionable forms of discrimination in violation of the Americans with Disabilities Act ("ADA") and Ohio law, and there are genuine issues of material fact on all elements of these claims.

1

## TABLE OF CONTENTS AND SUMMARY

**I. STATEMENT OF FACTS** ...................................................................................... 6

**II. LAW AND ARGUMENT** ................................................................................... 12

   **A. Standard for Summary Judgment** ............................................................... 12

*Summary judgment is proper when the moving party shows that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."* Fed. R. Civ. P. 56(a).

   **B. Application of Federal Law to State Disability Claims** ................................ 12

*Federal law regarding the ADA applies with equal force in evaluating Ohio law disability claims.* *Welch v. IAC Huron, LLC*, Case No. 3:12-cv-02334, 2013 U.S. Dist. LEXIS 129001, *7-8 (N.D. Ohio Sept. 10, 2013).

   **C. Bryan Mobley Was Discriminated Against on the Basis of His Disability Because He Was "Regarded As" Disabled By His Supervisors.** ................................. 13

*An individual demonstrates they were discriminated against because of the "regarded-as disabled" prong of the statute by showing that their employer "mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities" Ross v. Campbell Soup Co.*, 237 F.3d 701, 706 (6th Cir. 2001).

     1. Bryan Mobley's Supervisors Mistakenly Regarded His Impairments as Limiting. ................................................................ 13

*Mobley was regarded as having an impairment, and his supervisors' perception of his impairment was a but-for cause of his demotion to the Trash position. They testified that they moved him from the Surgery position to the Trash position because they were: (a) concerned that Mobley's "medical condition" [read: seizure disorder] required a move to a job where he was "around more people" and (b) Mobley's "confrontations with a*

*number of people in the OR" who were "making fun of him because of his speech." Such evidence is evidence that would require the finder of fact to conclude the employment action was the result of discrimination. Daugherty v. Sajar Plastics, Inc., 544 F.3d 696, 707 (6th Cir. 2008).*

**D. Bryan Mobley Was Discriminated Against Because MVH Failed to Provide Him with a Reasonable Accommodation** ..................................................... 17

*An employer's failure to reasonably accommodate is in and of itself a form of disability discrimination.  42 U.S.C. § 12112(b)(5)(A).*

1. Bryan Mobley Has a Disability ……………………………………...…………17

*Mobley testified repeatedly and consistently that he is a "special needs person" and that he has a disability.*

a. **Bryan Mobley is Substantially Limited in Several Major Life Activities and Has Substantially Impaired Bodily Functions** ..................................... 19

*Mobley is substantially limited in the "major life activity" of "speaking ... thinking, communicating, and working" and has an impairment of his "neurological [and] brain functions."  42 U.S.C. § 12102(2)(A)-(B).  He is also substantially limited in his ability to interact with others.  29 C.F.R. § 1630.2(i)(1)(ii).*

2. Bryan Mobley was a Qualified Individual……………………...………………22

*Mobley was qualified for and able to perform all the essential job functions of an Environmental Technician.  42 U.S.C. § 12111(8).*

3. Bryan Mobley's Supervisors Knew of and Had Reason to Know of His Disability..24

*Mobley's supervisors were generally aware of his seizure disorder, speech impediment, neurological condition, and difficulties interacting with others.  Also, the documentation that Mobley provided notified MVH of his disability.*

4.   Bryan Mobley Requested Reasonable Accommodations………..………………….24

*Mobley consistently and repeatedly requested that MVH (1) return him to the Surgery position or (2) adjust his job in the Trash position.  These requests are manifestly "requests for modifications or adjustments to the work environment."  29 C.F.R. §1630.2(o)(1)(ii).*

a.   **Mobley's request to return to Surgery was a reasonable accommodation and would not have created an undue burden**……………………………...……..27

*Mobley repeatedly asked to be returned to the Surgery position.  MVH ignored and rejected all such requests outright.  It offered no alternatives and never engaged Mobley in the interactive process.  There was no legitimate reason why Mr. Mobley could not have been moved back to Surgery or another housekeeping position.*

b.   **Mobley's request for job restructuring was a reasonable accommodation and would not have created an undue burden**……………………………...……..28

*Mobley repeatedly asked for assistance in performing his job or for the amount of his job to be reduced.  MVH ignored and rejected all such requests outright.  It offered no alternatives and never engaged Mobley to find out what was keeping him from performing the job.*

5.   MVH failed to provide the necessary accommodation………………..………….28

*MVH did not provide Mobley with any accommodation.  MVH's claim that Mobley did not properly make his request for accommodation known to its third-party administrator is false and misleading.*

**E. MVH Discriminated Against Mobley by Failing to Engage in the Interactive Process**. ................................................................................ 30

*MVH failed to engage in an interactive process with Mobley, a duty which "is mandatory and 'requires communication and good-faith exploration of possible accommodations.'" Keith v. County of Oakland, 703 F.3d 918, 929 (6th Cir. 2013). This precludes a granting of summary judgment.*

**F. Bryan Mobley's FMLA Claim is Hereby Dismissed**………………...………………31

**III. CONCLUSION**………………………………………………………………………31

## I.    STATEMENT OF FACTS

Bryan Mobley is a mentally and physically disabled, 56-year-old man.  In 1989, at age 31, Mobley suffered a cerebral abscess and stroke that left him with significant, permanent brain damage. (Plaintiff's Disputed Material Facts "PDMF", ¶84).  He has a significant speech and communication impairment and cognitive and neurological impairments. (PDMF ¶85).  A physician once described Mobley as having the same comprehension level as that of a third-grade child. (PDMF ¶86).

In 1997, however, Mobley stopped accepting Social Security Disability benefits so that he could work at Good Samaritan Hospital in Dayton. (PDMF ¶87).

In 2006, Mobley was hired away from Good Samaritan by MVH Hospital.  (DPUF ¶1). Initially, he was tasked with cleaning rooms in the medical imaging department.  (PDMF ¶98). About a year later, Mobley requested and was transferred to a position where he cleaned operating rooms after surgeries.  (hereinafter, the "Surgery" position)  (PDMF ¶89).  His regular job assignment was to clean surgery suites, along with a few other adjacent areas.  He worked continuously in the Surgery position until February 6, 2012.

In 2008, Joseph Zippilli became Mobley's supervisor.  (DPFU ¶3). They worked well together for years.  (PDMF ¶90).  For example, Mobley had difficulty using computers, and, so, on occasion, Zippilli gave Mobley extra assistance whenever he had to do computer training—an informal and generous accommodation. (PDMF ¶91).

While in the Surgery position, Mobley always received performance reviews that graded him as always meeting or exceeding expectations.  (PDMF ¶92).  He was "on time and accurate every scheduled work day."  (PDMF ¶93).  In mid-2011, he had a few negative run-ins with some co-workers who had been teasing him because of speech impediment and who had been

6

critical of the way he performed his job. (PDMF ¶94). He addressed these with Zippilli, who addressed those co-workers' supervisors and helped Mobley resolve the work conflicts. (PDMF ¶95). Mobley never received any form of formal discipline for his part in these negative interactions, and in his last performance review, in October 2011, Zippilli wrote that he had met his requirement of "building a positive work environment", consistently displayed professional conduct during interactions with coworkers, and consistently exhibited professional behavior". (PDMF ¶96).

On February 3, 2012, Zippilli informed Mobley that he was transferring him out of the Surgery position to a position known as "Patient Trash 2" (hereinafter, the "Trash" position). (DPUF ¶ 19, 20).

After he was transferred to the Trash position, Zippilli opened the Surgery position up for other employees to bid on. (PDMF ¶97). He had not opened the Trash position for bids. (PDMF ¶98). The Surgery position remained vacant for a while and was eventually filled by a person with no experience in Surgery. (PDMF ¶99).

Mobley considered the move to be a demotion and an increase in his job duties. The Surgery position had a reputation as being one of the better housekeeping jobs. (PDMF ¶100). A co-worker who learned of the move warned Mobley that the transfer evidenced that "they getting ready to fire you." (PDMF ¶101). Instead of the methodical detail work required in cleaning the surgical suites, his new primary duties were to, *inter alia*, empty patients' trash on the 4th and 6th floors of the hospital (approximately 90 rooms) and throughout the intensive-care unit. (DPUF ¶24). Instead of the detailed work he was used to in the Surgery position, Mobley described the pace required of him in the Trash position as that of a "race horse." (PDMF ¶102).

Nevertheless, Mobley agreed to go along with the change and to give it his best effort. (PDMF ¶103).  On his first day in the Trash position, he only got through about 25% of his job description.  (DPUF ¶30).  Mobley informed Zippilli that he "had concerns about the level of work necessary to complete" his job description and he was "sure that he could not complete the assignment." (PDMF ¶104).

On the second day of the Trash position, Mobley was confronted by Zippilli about wearing kneepads while working.  Mobley stated that he needed them when he kneeled down to pick up trash.  (PDMF ¶105).  Mobley then brought in a note from his doctor requesting that he be permitted to wear knee pads "due to past medical history."  (PDMF ¶106).  Zippilli sought advice from human resource representative Bernita Ricks about the issue, and she replied that this was a "reasonable request" and that it should be permitted as an accommodation. (PDMF ¶107).

For much of his employment, Mobley had been continuously approved for intermittent FMLA leave.  On February 14, 2012 Mobley was scheduled to work, but he felt ill.  To call off, he contacted MVH and spoke to Bob Wiley (a daytime housekeeping supervisor).  Mobley told Mr. Wiley that he would not be in that day.  (PDMF ¶108).  He also timely notified CIGNA (MVH's third-party benefits administrator) that he needed to take an intermittent FMLA day for the 14th. (PDMF ¶109).  He went to and was seen by his doctor.  (PDMF ¶110).

The next day, Mobley was asked why he had been absent the day before.  He told Zippilli that he had been out sick and had been to see the doctor. He also informed Zippilli that he had called in and spoken to Mr. Wiley. (PDMF ¶111).  Although Zippilli never asked Mr. Wiley to verify whether this was true or not. (PDMF ¶112), he issued a "Step 3: Written Warning" for a "No Call No Show." (DPUF ¶49).

Approximately ten days into the Trash assignment, on about February 16th, Mobley brought in a second recommendation from his doctor.  This request stated:

> In my medical opinion and with his current diagnosis of migraine cephalgia, hypertension, and seizure disorder, I am of the opinion that Mobley will not be able to fulfill the added job responsibilities. Please return Mobley to his prior job responsibilities. (PDMF ¶113).

Mobley's supervisors and human resources took no action in response to receiving this letter. (PDMF ¶114).  Instead, the next day, at a meeting, Mobley's supervisors all concluded that his performance in the Trash position was "a level of effort issue."  (PDMF ¶115).

A few days later, on February 22nd, Mobley brought his supervisors a hand-written letter explaining that he is a "special needs person" with a "lifetime medical condition."  (PDMF ¶116).  He complained that his doctor's notice of his "medical condition and limitations [] seems to have been disregarded" and "[w]ith this transfer, I can't physically perform this job description in the time that has been set for me."  (PDMF ¶117).  Without any explanation, Mobley's supervisor told him that "he would not be returned to his former position" but to take this letter to human resources "for investigation."  (PDMF ¶118).  Although human resources received this letter, once again, no action or investigation was undertaken.  (PDMF ¶119).

The next day, on February 23rd, Mrs. Mobley sent an email to her husband's supervisor. She pleaded that Bryan came "off full disability to work an eight hour job again.  A stroke and two brain surgeries, a limp, total confusion, not to be able to form words…I [implore] you to check this job schedule over very carefully before a decision is made to destroy him…He is a seizure patient who can not be over loaded with this type of work schedule."  (PDMF ¶120). Mobley's supervisor never responded to Mrs. Mobley.  (PDMF ¶121).  Instead, that evening, Mobley's supervisors again concluded that although Mobley told them "he cannot accomplish these tasks in total according to the schedule…this is a level of effort issue."  (PDMF ¶122).

The next day, on February 24th, Mobley presented his employer with another doctor's request—this time from his neurologist.  The neurologist noted Mobley's seizure disorder and "recommended that he work on light duty during his 8 hour shifts at work due to his medical condition." (PDMF ¶123).  In response to this, MVH immediately suspended Mobley.  He was told that "it is not MVH's policy to accommodate light duty."  (DPUF ¶56).

Zippilli then told Mobley to speak to human resources, his doctor, and perhaps CIGNA about short-term disability.  (PDMF ¶124).  Mobley did all three.

Mobley spoke to CIGNA, and a CIGNA representative reported back to MVH that Mobley was concerned that "his supervisor was not making the required accommodations and has advised him he should file for [short-term disability].  Bryan indicated that he does not need to be off continuously and wants to work." (PDMF ¶125).

Mobley also spoke to Bernita Ricks in Human Resources about the problems he was having in the Trash position.  Ms. Ricks told him that she would speak to Zippilli and would instruct him to return Mobley to the Surgery position or to reduce his job load in the Trash position.  (PDMF ¶126).  When she spoke to his supervisors about it, they said the job "could be done by one person," and "no, they would not move him back."  (PDMF ¶127).

And, on about February 28, Mobley also brought in yet another note from his neurologist. This letter clarified his recommendation that "Mobley not be on light duty but return to his prior job responsibilities."  (PDMF ¶128).  After receiving this, MVH sent Mobley back to the Trash position, but refused to return Mobley to his prior job responsibilities in Surgery.  (PDMF ¶129).

Mobley returned from his "light duty" suspension on February 29th.  He was, again, not able to finish more than one floor of trash pickup.  (PDMF ¶130).  For his performance on the 29th, MVH issued a "Step 4: Final Warning."  (DPUF ¶60).

Throughout this time, Mobley's supervisors continued to state in writing that "[n]o additional training is required, this is a level of effort issue…[and] not one of competency to perform the tasks. (PDMF ¶131).  Despite this, on March 2nd, Zippilli assigned a "trainer" named Kenny to "demonstrate patient trash removal in three rooms" then to observe and coach Mobley the rest of the evening. (PDMF ¶132). Mobley observed Kenny's performance, and then asked Kenny whether he had ever done a Trash position before.  Kenny said he had not.  (PDMF ¶133).  Mobley then told Zippilli that "he and Kenny do things the same way," he thanked Kenny, and said he did not "think he needed Kenny anymore."  (PDMF ¶134).

On March 6, 2012, Mobley submitted an internal grievance form to MVH with two personal letters asking why he was moved to a job description that "exceeds [his] medical condition and limitations" and asking to be returned "to the unit I have worked...on the schedule I was on—or cut this work schedule he has put me on."  (PDMF ¶135).  Although it was delivered to MVH, its human resources representative, Ms. Ricks never reviewed it.  (PDMF ¶136).  At her deposition, she did not know if the grievance was ever followed up on.

On the morning of March 8, 2012, a letter from the undersigned was hand-delivered to MVH's human resources and legal departments on the morning of March 8, 2012.  (PDMF ¶137). The letter explicitly notified MVH of Mobley's impairments, a request for a reasonable accommodation, and an invitation to engage in the interactive process.  (PDMF ¶138).

MVH terminated Mobley **just a few hours** after receiving the letter Mobley's attorney. (PDMF ¶139).  He had worked **just 16 days** in the Trash position. (PDMF ¶140).

After his termination from MVH, Mobley was unable to find gainful, full-time employment.  Mobley has been forced to return to public Disability benefits.  (PDMF ¶141).  At his deposition, Bryan Mobley wept as he described the impact his termination:

I'm still emotionally disturbed of what they done to me.  They have -- just stripped me down. You know, they took -- you know, my job from me. You know, like I can't survive out here, you know, I can't provide for my family, you know -- and I can't provide for my wife like I -- a husband should. (PDMF ¶142).

## II.   LAW AND ARGUMENT

### A.   Standard for Summary Judgment

Summary judgment is proper when the moving party shows that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "On a motion for summary judgment, the court must view all evidence and draw any reasonable inferences therefrom in favor of the nonmoving party."  (MVH's third-party benefits administrator) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348 (1986)); *Ahlers v. Schebil*, 188 F.3d 365, 369 (6th Cir. 1999) ("Credibility judgments and weighing of the evidence are prohibited during the consideration of a motion for summary judgment).  This Court may grant summary judgment only when the evidence "is so one-sided that one party must prevail as a matter of law."  *Rorrer v. City of Stow*, 2014 U.S. App. LEXIS 3592, *23, 2014 FED App. 0038P (6th Cir. February 26, 2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

### B.   Application of Federal Law to State Disability Claims.

For the purposes of Mobley's Ohio disability discrimination claims under R.C. § 4112.02, this Court may apply to federal case law, federal ADA regulations, and the ADA itself including the Americans with Disabilities Amendments Act of 2008.  *Welch v. IAC Huron, LLC*, Case No. 3:12-cv-02334, 2013 U.S. Dist. LEXIS 129001, *7-8 (N.D. Ohio Sept. 10, 2013); see also *Johnson v. City of Pataskala*, Case No. 2:12-cv-100, 2013 U.S. Dist. LEXIS 117204, *5-6 (S.D. Ohio Aug. 19, 2013).

**C.    Bryan Mobley Was Discriminated Against on the Basis of His Disability Because He Was "Regarded As" Disabled By His Supervisors.**

Mobley's first cause of action is that he was unlawfully discriminated against because of his disability and regarded as disabled by his supervisors.  The regarded-as-disabled cause of action "protects employees who are perfectly able to perform a job, but are rejected because of the myths, fears and stereotypes associated with disabilities." *Gruener v. Ohio Cas. Ins. Co.*, 510 F.3d 661, 664 (6th Cir. 2008)).  This cause of action relates to Mobley's discriminatory transfer from the Surgery to the Trash position and MVH's refusal to return him to it.

Under the ADA, an individual demonstrates they were discriminated against because of the "regarded-as disabled" prong of the statute by showing that their employer "mistakenly believes that the person has a physical or mental impairment and consequently discriminates against [him]." *Ross v. Campbell Soup Co.*, 237 F.3d 701, 706 (6th Cir. 2001)(citing *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489 (1999)); 42 U.S.C. § 12102(3)(A); 29 C.F.R. § 1630.2(g)(1)(iii).  And, as this Court noted in *Peters v. Univ. of Cincinnati College of Med.*:

> When evaluating a regarded-as claim, the Court looks not to the individual crying foul but to the state of mind of the entity against whom []he makes h[is] claim. This is a question, therefore, of intent.  Consequently, such a claim is 'rarely susceptible to resolution at the summary judgment stage.'

*Peters v. Univ. of Cincinnati College of Med.*, Case No. 1:10-CV-906, 2012 U.S. Dist. LEXIS 126426, *26-27 (quoting *Ross v. Campbell Soup Co.*, 237 F.3d 701, 706 (6th Cir. 2001)).

      1.    <u>Bryan Mobley's Supervisors Mistakenly Regarded His Impairments as Limiting.</u>

In this case, there is ***direct evidence*** that Mobley was regarded as having an impairment and that his supervisors' perception of his impairment was a but-for cause of his demotion to the Trash position.  Direct evidence is evidence that would require the finder of fact to conclude the employment action was the result of discrimination. *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d

696, 707 (6th Cir. 2008). "[D]irect evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated . . . by prejudice against members of the protected group." *DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir. 2004).

When Mobley was transferred from the Surgery position to the Trash position, his supervisors admit that the two reasons they wanted to move him were: (a) a concern that Mobley's "medical condition" [read: seizure disorder] required a move to a job where he was "around more people" and (b) Mobley's "confrontations with a number of people in the OR" who were "making fun of him because of his speech."

When asked why he transferred Mobley from the Surgery position to the Trash position, Zippilli testified that he considered Mobley's "compatibility [] for the work environment.  Part of that was – is – is confrontations with a number of people in the OR, his medical condition, and just normal business."  (UCRC, p. 20).

At deposition, Zippilli elaborated on his belief that Mobley's' medical condition justified his transfer.  Zippilli testified that he wanted Mobley's new position "to be in a -- more public area where he was -- at less risk…The medical condition was how I felt that -- he needed to be around more people, not in an isolated spot."  (Zippilli Depo. p. 117,135).  Zippilli, it seems, was concerned for Mobley's safety if he were to have another seizure at work.  In fact, shortly before the transfer, Zippilli noted in Mobley's employment file that "[b]ecause I am aware of Bryan's medical condition, I paged him to see if he was alright…his medical history necessitates that I try to locate him if he has not been seen for a while."  (Ex. 3).  Zippilli also confirmed that he was considering "a change of venue for Bryan" if he was not able to disqualify him from a "fitness for duty angle."   (Ex. 69; Benton Depo. p. 20).

Further, at Mobley's unemployment hearing, MVH initially attempted to justify his transfer as an attempt to "rotate" or "cross-train" someone else in the Surgery person. (UCRC, p. 19). At Zippilli's deposition, however, when asked why Mobley was selected to be transferred to the Trash position—as opposed to the other three full-time Surgery housekeepers—he testified:

> When you -- when I look at Bryan and -- the episodes that he had health wise, I was concerned about him. When he had passed out in the OR, he was isolated by himself. For his welfare, I wanted to put him in a populated area… (Zippilli, Depo. p. ¶117).

This is direct evidence that Zippilli mistakenly believed that Mobley's seizure disorder made him unable to perform the Surgery position.

Mobley's supervisors also confirmed that they transferred Mobley in part, because of his difficulties interacting with his co-workers. They "were concerned about Bryan's ability to be a team player in [Surgery]." (Benton Depo. p. 20). In its brief, MVH characterizes these as "confrontations with co-workers," but Zippilli's deposition testimony describes the reality of the situation: Mobley was not getting along with his co-workers because he had difficulty interacting with others and his co-workers were teasing him about his speech impediment:

> Q. Some of your notes talk about that he was isolating himself from other people during his employment? …
> A. Bryan shared with me that -- he has a circle and there's only a very few people that he allows within that circle. And that described isolation to me. … Bryan would not participate in activities with other employees, like didn't lunch with other employees, didn't hang out with other employees. You know, employees sort of form groups. And Bryan was his own group.
> Q. Did he ever talk to you about -- him being called names?
> A. Yes. … He would just say that an individual was making fun of him because of his speech or they would – you know, it was kind of like cruel things that children would say to other children when you have an affliction of some sort. I can't give you specifics but on occasion he would bring that information to me.
> Q. And what would you tell him in response to him bringing these things to you?

> A.      I would ask him if he wanted me to do anything about it with the person so as not to heighten the situation where the employees might go behind our backs -- our backs meaning the managers -- and continue to harass him. If he said yes, he wanted me to do something about it, then I would have contact with the individual who was mak-- was doing the harassing or with the management -- management of that person.  (Zippilli 47-49).
>
> ….
>
> Q.      And the complaints [by co-workers] in 2011, did you talk to Bryan about all of them?
>
> A.      Yes.
>
> Q.      And what -- what did he say or what was his --typical reaction when you said hey, so and so's got a problem with you?
>
> A.      Well, he would share his side of the story. … And I listened and documented down what he had to say. …There were disagreements between work process, who was responsible for doing specific tasks and – the idea was that they felt like Bryan was overstepping his role into their role and wanted to -- and wanted him not to do that anymore. …
>
> Q.      Okay.  Were any of these complaints made by folks that Bryan had made you aware of were teasing him?
>
> A.      Yes.  (Zippilli Depo. p. 75-76).

Cognizant of the difficulties Mobley was having with his co-workers, they desired to move Mobley from Surgery to a position "where Bryan would be working by himself, where he wouldn't have to work as a team or have to have a lot of interaction with other team members." (Benton Depo. p. 21).  Again, this is evidence that Mobley's supervisors believed that his social difficulties and communication impairments limited his ability to perform the Surgery position.

These two justifications for this transfer from Surgery to Trash—a paternalistic worry about his seizure disorder and a desire to put him in a position where his social difficulties would not cause any more conflict—are direct evidence of discrimination.[1]  There is no inference necessary. A reasonable fact-finder could conclude that the transfer was motivated because his supervisors regarded Mobley has having an impairment and were motivated by their

---

[1] Even if this Court concluded that there was not *direct* evidence, it would be *indirect* evidence that, combined with the other facts of this case, would satisfy a *prima facie* case that 1) Mobley was disabled; 2) he was qualified for the Surgery position; 3) his transfer to the Trash position was an adverse employment decision; 4) his supervisors knew of his disability; and 5) after his transfer, the position remained open or the individual was replaced.  See e.g.
*Johnson v. City of Pataskala*, Case No. 2:12-cv-100, 2013 U.S. Dist. LEXIS 117204, *6 (S.D. Ohio Aug. 19, 2013).

misperceptions and prejudices about those impairments.

**D.    Bryan Mobley Was Discriminated Against Because MVH Failed to Provide Him with a Reasonable Accommodation.**

Mobley brings a second cause of action against MVH for its failure to provide him with a reasonable accommodation.  In this case, Mobley does not contest that he could not perform the entire job description for the Trash position in an 8-hour shift.  Instead, he requested two distinct reasonable accommodations from MVH, both of which were rejected and ignored.  MVH never proposed any alternative accommodation.

An employer's failure to reasonably accommodate is in and of itself a form of disability discrimination.  42 U.S.C. § 12112(b)(5)(A).  A *prima facie* case of for failure to accommodate is proven by showing that: (1) he is disabled; (2) he is otherwise qualified for the position; (3) the employer knew or had reason to know about his disability; (4) he requested an accommodation; and (5) the employer failed to provide the necessary accommodation. *Myers v. Cuyahoga Cty*, 182 Fed. Appx. 510, 515 (6th Cir. 2006).  "Once the plaintiff has presents a *prima facie* case, the burden shifts to the employer to demonstrate that the employee cannot reasonably be accommodated, because the accommodation would impose an undue hardship on the operation of its programs." *Gaines v. Runyon*, 107 F.3d 1171, 1176 (6th Cir. 1997).[2]

There is a genuine issue of material fact on each element of his *prima facie* case and MVH's claim of undue burden is contradicted by the testimony of its own employees.

1.    Bryan Mobley Has a Disability.

MVH argues that Mobley does not have a disability.  The evidence contrary to this is overwhelming.  Moreover, MVH's legal authority on this subject are cases and regulations that pre-date the ADA Amendments Act of 2008; which expanded the definition of "disability".

---

[2] In its brief, MVH effectively disputes every element of Mobley's *prima facie* case and argues that, even if his requests to return to his former position were "reasonable accommodations," they would have created an undue burden on the employer.

MVH begins its argument by claiming that because Mobley "admitted he was not disabled," his case should be dismissed. This is—to be blunt—a cheap point made off a proud, neurologically-challenged individual. It is true that Mobley does not consider himself *disabled*, and he testified as such. Mobley testified repeatedly and consistently that he is a "special needs person" and that he *has a disability*, but he is not *disabled*:

> Q. This [letter to MVH] says "I am a special needs person." What do you mean by a special needs person? …
> A. That I mean that by -- and -- that I'm a person that had had -- like a stroke and two brain surgeries, you know. And since you asked me I'm going to tell you, you know, and -- that I'm not disabled, just -- on some things, that -- I -- I am -- I -- like I'm able but up and basic-- there's some things I just can't remember, you know, at times. You know. And up and knowing that Joe Zippilli, Mike Benton, you know, and Danny Smith knew this. (Mobley Depo. p. 144).
> …
> Q. You claim you have a disability, correct?
> A. Yes.
> Q. What is your disability? …
> A. My disability is -- it's kind of hard for me to explain. Wait a minute -- I didn't mean to say that. Wait a minute. I probably need to breathe --can I get … My disability is my impairment of a speech impediment, headaches. It's hard for me understand certain things. You up and have to repeat certain things back to me, you know, sometime. My short term memory. (*Id.* at 179-81).

Only in a bizarre game of semantics could one ask *What is your disability?*, receive an answer, and then claim that someone *admitted* they were not disabled.

Luckily, the ADA does not offer protection to only those who claim they are *disabled*. Rather, the law offers protection to any "individual[s] with a *disability*." 42 U.S.C. §12112(a) (emphasis added). And to that point, Mobley was unequivocal: he has a disability.

### a. Bryan Mobley is Substantially Limited in Several Major Life Activities and Has Substantially Impaired Bodily Functions.

Next, MVH argues that Mobley's impairments do not constitute a disability, as that term is defined under the ADA. One of the ADA's definitions of "disability" is "a physical or mental impairment that substantially limits one or more major life activities of such individual."

42 U.S.C. § 12102(1)(A).[3]  A "major life activity" is defined to include, *inter alia* "speaking …

thinking, communicating, and working" or an impairment of a major bodily function such as

"neurological [and] brain functions."  42 U.S.C. § 12102(2)(A)-(B).  "Interacting with others" is

also a major life activity.  29 C.F.R. § 1630.2(i)(1)(ii).

Complete recitations of the full scope and breadth of Mobley's disabilities and

impairments can be gathered from the Affidavits of Dr. Paul A. Martin and Mrs. Mary Jo

Mobley, R.N. (neither of whom were deposed by Defendant).  Their lengthy and detailed

descriptions of Mobley's condition are incorporated herein.

To summarize, however, Dr. Martin attests that Mobley suffers from a number of

physical and mental impairments due to his brain injury and several automobile accidents.

(Martin Aff. ¶3).  He has a seizure disorder, impaired cognition, altered mental status, a liver

condition (which causes confusion), and disarthria and apraxia of speech.  (*Id.* at ¶3-6).  He

pointedly concludes:

> It is my professional medical opinion that Bryan Mobley has physical and
> mental impairments that substantially limit major life activities.  He is
> substantially limited in his ability to speak, think, and communicate.
> These limitations are due to the substantially impaired function of
> Mobley's neurological, brain, and liver functions.  (*Id.* at ¶7).

Dr. Martin's is the only expert testimony that is before this Court on this Motion.

Mrs. Mary Jo Mobley (herself a retired, registered nurse) attests that her husband has "a

severe speech and communication impairment," "significant cognitive and neurological

impairments," emotional and social difficulties, and memory problems.  (Mrs. Mobley Aff. ¶5-

7).  These are in addition to his seizure disorder.  (Mrs. Mobley Aff. ¶7(a)).

---

[3] It also defines "disability" as a "being regarded as having such an impairment."  42 U.S.C. § 12102(1)(C).  If this
Court finds that Mobley was regarded as having a disability (as argued in Section C, *supra*) this Court need not
address whether he has a physical or mental impairment under 42 U.S.C. § 12102(1)(A).

And Mobley identified his own speech problems, comprehension impairment, memory impairment, and seizure disorder as being his disabilities. (Mobley Aff.. 148, 179-81). His supervisors at MVH acknowledged his speech impairment, seizure disorder, and difficulties interacting with others. (PDMF ¶143, 144, and 147).

 Each of these impairments are, by themselves, disabilities under the ADA.

First, MVH never disputes that <u>his seizure disorder is a disability</u>; a disability that, by definition, substantially limits his neurological function. See, e.g. *Overlook Mut. Homes, Inc. v. Spencer*, 666 F. Supp. 2d 850, 859 (S.D. Ohio 2009)(citing with approval a federal agency's policy using seizure disorder as example of a disability); *Reeves v. Case Western Reserve Univ.*, Case No. 1:07-cv-1860, 2009 U.S. Dist. LEXIS 90308, *5 (N.D. Ohio Sept. 30, 2009)(seizure disorder recognized as a disability).[4]

The Sixth Circuit noted last month that <u>a speech impediment and stutter is a disability</u>. *Wright v. Memphis Light, Gas & Water Div*., 2014 U.S. App. LEXIS 4348, *2 (6th Cir. March 6, 2014)(a "stuttering impairment substantially limits his ability to speak and communicate effectively."). Although Mobley's supervisors all confirmed that Mobley has a speech impediment. (PDMF ¶147). And Mr. Benton confirmed that he recognized that Mobley "often kind of became confused or got off track in conversations" and "looped around in conversations." (Benton Depo. 12-13). Zippilli confirmed that "one had to be patient and wait for him to -- to get it out. (Zippilli Depo. p. 38).[5]

---

[4] The EEOC agrees with this position. See *Questions & Answers about Epilepsy in the Workplace and the Americans with Disabilities Act* ("As a result of changes made by the ADAAA, individuals who have epilepsy should easily be found to have a disability within the meaning of the first part of the ADA's definition of disability because they are substantially limited in neurological functions and other major life activities (for example, speaking or interacting with others) when seizures occur.")  http://www.eeoc.gov/laws/types/epilepsy.cfm#fn9 (last visited April 7, 2014).
[5] The Court granted leave for Plaintiff to submit an audio clip demonstrating Defendants' speech impediments. The clip submitted is the audio transcript of Mr. Mobley's unemployment hearing. Mr. Mobley's testimony begins at

His <u>mental and neurological impairments are clearly a disability</u>.  His brain injury and liver functions cause memory problems, confusion, impaired cognition, and "altered mental states."  (Martin Aff. ¶3,5).  Zippilli testified that Mobley's "neurological condition…became apparent over time."  (Zippilli Depo. p. 56).

Mobley's difficulties interacting with others is a disability.  29 C.F.R. § 1630.2(i)(1)(ii).  His difficulties interacting with others is a combination of his speech impediments, his confusion, his cognitive difficulties, and hearing impairment.  (Mrs. Mobley Aff. ¶5(d)-(g), 6(g), 7(c).)  His "isolation" from his co-workers was noted by Zippilli.  (Ex. 8).

Moreover, the combined effect of his impairments means that Mobley is substantially limited in the major life activity of working.  An individual is substantially limited in 'working' if they are restricted from performing *"either a class of jobs or a broad range of jobs in various classes." McKay v. Toyota Motor Mfg., U.S.A*., 110 F.3d 369, 372 (6th Cir. 1997)(quoting 29 C.F.R. § 1630.2(j)(3)(i)).  Given his impairments, it is conceivable that Mobley is <u>restricted from performing nearly *every* job that is NOT a simple, janitorial job</u>.

In this case, there can be no doubt that there is a genuine issue of material fact that Bryan Mobley is disabled.

        2.     <u>Bryan Mobley was a Qualified Individual</u>.

Here, MVH's brief and story contains three inherent contradictions.  First, MVH denies that there was nothing unfair or discriminatory about its transfer of Mobley from Surgery to the Trash position.  Its basis for this argument is that all MVH housekeepers have the same primary job description and are expected to perform all housekeeping tasks.  (DPUF ¶5).  And so, MVH argues, the housekeeping managers are permitted to move employees within the department at

---

minute marker 33:30 and ends at minute marker 54:12.  The portion of his testimony most germane to this inquiry is found between minute 42:30 and 45:30.

their discretion.  (DPUF ¶5).  To this point, Mobley's supervisors all stressed that housekeepers all have the same job code and are considered to be interchangeable with each other, though they may have different regular job assignments.  (Smith Depo. p. 16-17).  When Mobley went from Surgery to Trash, his job code never changed—just his assigned daily tasks.  To this end, MVH even points out that in his 2006 physical, Mr. Mobley was certified to perform the "essential functions" of his job as an Environmental Technician.  (DPUF ¶2).

Then, in direct contradiction of this notion, MVH argues that the "essential functions" of Mobley's job were every discrete task assigned to him in the *Trash position*.  This would mean that every single one of Mobley's essential functions changed in the transfer from Surgery to Trash.

MVH's brief then contradicts itself again when it argues that "Mobley's performance issues in the Patient Trash 2 position resulted from a deliberate lack of effort … There was never a time that Mobley's supervisors thought Mobley did not have the ability to do the job." (Doc. No. 19, PAGEID#68).  MVH cannot have it all three ways.

A "qualified individual" is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires … [I]f an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job."  42 U.S.C. § 12111(8).  The Sixth Circuit has held that "performing the essential functions" of a position does not mean that one has to be able to perform *every* possible task in *every* possible assignment one could be rotated to.  *Kiphart v. Saturn Corp.*, 251 F.3d 573, 585-86 (6th Cir. 2001)

Notably, in its brief, MVH does not cite its *own list* of the essential functions of this position.  On the second page of Mobley's performance reviews, MVH states his position is "Environmental Technician", and it lists the duties and responsibilities expected of an Environmental Technician.  (Ex. 8).  It then states that these "may be essential job functions subject to reasonable accommodations."  (*Id*.).  All of these essential functions are general requirements, not specific to any particular position, e.g. Surgery, Trash, etc.

There can be no question that Mobley was qualified to perform his job as a housekeeper/Environmental Technician <u>without reasonable accommodation</u>.  He did so for over five years—always meeting or exceeding MVH's expectations—in the Surgery position and, formerly, in the medical imaging department.  (PDMF ¶92).  Also, it is undisputed that he knew how to and could physically perform the job tasks required in the Trash position; it was only the *amount* of work assigned him in the Trash position that he could not complete.

Finally, it should be remembered that, per the text of the ADA, the "qualified individual" analysis extends to the position that he held (Trash) and to the position he desired (Surgery).  See 42 U.S.C. § 12111(8).  In so far as Mobley repeatedly stated his desire to return to Surgery, and in so far as he had demonstrated his ability to perform the tasks and essential functions in Surgery, a fact finder could find that Mobley was a "qualified" for the job that he held for years.

> 3. <u>Bryan Mobley's Supervisors Knew of and Had Reason to Know of His Disability</u>.

Although MVH does not specifically address this prong of *the prima facie* case, it generally denies throughout its brief that its supervisors *considered* Mobley impaired or disabled. This is wholly rebutted by the testimony and writings of Zippilli and Mr. Benton, referenced in Section C, *supra*, demonstrating that they explicitly considered his "medical condition" (read: seizure disorder) before they transferred him to the Trash position.

24

With respect to this "failure to accommodate" cause of action, there are the additional facts that his supervisors admitted that they were generally aware of his seizure disorder, speech impediment, neurological condition, and difficulties interacting with others.  See Section D(ii), *supra*.  Moreover, MVH received: (1) three doctors' notes describing his medical conditions (Ex. 38, 42, 47); (2) a letter from Mobley describing himself as a "special needs person" (Ex. 4); (3) a letter from Mrs. Mobley describing her husband as having had "A stroke and two brain surgeries, a limp, total confusion, not to be able to form words…[and] a seizure patient" (Ex. 45); and (4) a letter from his attorney (the undersigned) detailing "his brain injury and the resultant chronic migraine headaches and seizure disorder… significant mental and physical limitations that impair his short-term memory, his fine and gross motor skills, his ability to speak clearly, his ability to quickly process new information, [and] his ability to adjust to new situations."  (Ex. 78).  Any of these alone were sufficient to place MVH on notice that he had a disability, and taken together, a reasonable fact-finder could easily conclude the same.

4.      Bryan Mobley Requested Reasonable Accommodations.

In its brief, MVH argues that Mobley never requested a reasonable accommodation.  This is verifiably incorrect.  This issue can be immediately and easily resolved by the letter from the undersigned that was hand-delivered to MVH's human resources and legal departments on the morning of March 8, 2012.  (Ex. 78).  This letter explicitly stated that its purpose was "to formally request that MVH provide to Mobley a reasonable accommodation for his disability." (*Id*.)  Mobley was, of course, fired several hours later.  (PDMF ¶139).

Nevertheless, even if MVH denies the import of this letter or its own language, there remains the fact that, while in the Trash position, Mobley consistently and repeatedly requested that MVH (1) return him to the Surgery position or (2) adjust his job in the Trash position.

These requests are manifestly "requests for modifications or adjustments to the work environment." 29 C.F.R. §1630.2(o)(1)(ii).

Also, once again, MVH's brief makes much of an alleged "admission" by Mobley. MVH argues that Mobley "admits he never requested any accommodation," his case should be dismissed.  The snippet from Mobley's deposition testimony cited by MVH, read in context, demonstrates that Mobley believed he was not asking for any "special treatment" from MVH, e.g. he felt he was only asking his supervisors to treat him like a regular person.

Further, MVH's own internal statement demonstrates that it considered Mobley's request to be one of accommodation.  When MVH received his neurologist's request that he be placed on light duty, MVH responded that "it is not MVH's policy to **accommodate** light duty."  (Ex 46).  MVH's argument demonstrates an Orwellian view of semantics where it can say that it won't *accommodate a request* but then claim that Mobley never *requested an accommodation*.

Luckily, the law does not require someone to use the magic words *reasonable accommodation*" "an individual may use 'plain English' and need not mention the ADA or use the phrase 'reasonable accommodation.'" See EEOC Enforcement Notice No. 915.002, Oct. 17, 2002[6] (citing *Schmidt v. Safeway Inc.*, 864 F. Supp. 991, 997 (D. Or. 1994)("the employee need not mention the ADA or even the term 'accommodation.'").

The record is replete with numerous examples confirming that Mobley requested to either (1) return him to the Surgery position or (2) adjust his job in the Trash position.

First, Mobley asked Zippilli several times for help in completing the Trash position:

I shared with him that it was too much work and I couldn't get off the sixth or the fourth floor, you know, because of the rooms and I shared with him, you know, if -- I did -- you know, could probably get some help up there, you know, and -- he -- you know, just told me to find a routine, you know, and I shared with him that I'm doing the best I can up there. (Mobley Depo. p. 92).

---

[6] Available at http://www.eeoc.gov/policy/docs/accommodation.html#N_19_  (last accessed April 10, 2011).

…

> Q.      And when you say you needed some help, what kind of help did you need?
> A.      I share with Joe Zippilli that I needed some help.  That's why I could not up and do the job description. …
> Q.      So the help that you wanted was to eliminate some of the functions of the job –
> A.      Yes, yeah. …
> Q.      Okay.   And when you -- requested that they eliminate some of the functions of the job description, what was Zippilli's response?
> A.      He up and did not respond back to me, you know, in a timely manner. (*Id.* at 133-35).

Then, Mobley turned to his former supervisor for help, which Zippilli stymied:

> A.      Mr. Bob Wiley, you know, told me that I had to … come to him and I would turn around and he would walk over the area with me, you know, to see what needs to be changed about the [job description].
> Q.      Okay.
> A.      You know, to see what else needed to be deleted from the job description.
> Q.      When did you have this conversation with Bob Wiley about the job description?
> A.      When he found out that I was transferred….
> Q.      Did you talk to Joe Zippilli about your conversation with Bob Wiley?
> A.      Yes, and he stated to me, you know, and he always say -- that he's not your supervisor. … He shared with me that I didn't even need a hand, just -- find a routine.  (*Id.* at 134-137).

Next, Mobley asked Bernita Ricks in Human Resources for help, and she told him that "she would speak with Joe Zippilli to see about returning me to my regular schedule or cut the work load from me." (PDMF 126-27).  She did so, but his supervisors refused to make either accommodation. (*Id.*).

These numerous oral requests are, of course, in addition to the numerous documents that MVH received from Mobley's doctors, his wife, his attorney, and him personally.  (Ex. 38, 42, 47, 4, 45, 78).  Each of these documents variously requested either that he be returned to his prior job responsibilities or that his job responsibilities be lightened.  None of these prompted any action by MVH except the one doctor's note for which MVH immediately suspended him.

27

Although it appears that MVH never gave great consideration to Mobley's requests for accommodation, MVH now argues that his requests were not proper and would have caused MVH an undue burden.  It should be remembered that these are MVH _never_ communicated to Mobley why his requested accommodations could not be made.

> **a. Mobley's request to return to Surgery was a reasonable accommodation and would not have created an undue burden**.

Mobley repeatedly asked to be returned to Surgery.  MVH ignored or rejected all such requests outright.  It offered no alternatives.  It never engaged in the interactive process.

Returning to the Surgery position was a reasonable accommodation.  After he was taken off the Surgery position, it remained vacant for a considerable amount of time.  (PDMF ¶99).  The restarting of "conflicts with the surgical staff" cited by MVH as the reason for not returning him to Surgery is pretextual as argued in Section C, *supra.*

So too, would have been a move to some other housekeeping job assignment. Zippilli stated that he rotates housekeeping employees to different job assignments on a <u>daily</u> basis, and employee turnover regularly creates new openings.  (Zippilli Depo. p. 115-16; DDMF 148).  Miami Valley never evaluated or proposed any of those daily openings.  (PDMF ¶149).

In fact, Zippilli testified that the Trash position that he placed Mobley into had recently been vacated by an employee who had been transferred to a different housekeeping job because she had been having "performance issues."  (Zippilli Depo. p. 121).  This apparently caused MVH no undue burdens.  To that end, Smith and Benton both admitted that *there was no reason* that Mobley couldn't have been assigned to any of "the other housekeeping positions that Mr. Zippilli oversees."  (Benton Depo. p. 97-98; Smith Depo. p. 85)  A reasonable finder of fact could conclude that Mobley could have been returned to his former position or a different housekeeping position with no undue burden to MVH.

### b. Mobley's request for job restructuring was a reasonable accommodation and would not have created an undue burden.

Mobley repeatedly asked for assistance in performing his job or for the amount of his job to be reduced.  MVH ignored and rejected all such requests outright.   It offered no alternatives and never engaged Mobley to find out what was keeping him from performing the job.  In its brief, MVH argues that it *presumes* that his request for light duty was to only perform 25% of his job.  It is forced, to *presume*, however, because it never actually engaged with Mr. Mobley to find out what he might need to perform his job.

Nor can MVH credibly claim that such light duty would create an undue hardship.  To the contrary, its clear that MVH makes light duty available to employees who receive Workers' Compensation.  A jury could easily conclude that if MVH makes light duty available injured employees, it could just as easily make light duty available to Mobley either permanently or until another housekeeping position opened up.

### 5.   MVH failed to provide the necessary accommodation.

MVH does not specifically contest this element of Mobley's *prima facie* case.  There is no doubt that MVH did not provide Mobley with any accommodation.

Instead, MVH seeks to flip fault onto Mobley for not bringing the matter to CIGNA for resolution.  In its brief, it states that Mobley was required to have his disability documented, certified, and determined through CIGNA.  (PAGEID# 75).  This is inconsistent with both the facts and the law.

First, the record is clear that Mobley did go to CIGNA for help with seeking accommodations.  A CIGNA representative reported back to MVH that Mobley was concerned that "his supervisor was not making the required accommodation" (Ex 67).

Second, MVH's contention is contrary to its own practice—specifically, how it dealt with Mobley's first request for accommodation, his request that he be permitted to wear kneepads. Only a few days before he requested a return to his former position, Mobley brought in a note from his doctor requesting that he be permitted to wear knee pads "due to past medical history." (Ex 35). He delivered that note to Zippilli, who then sought advice from Ricks about the issue. (Ex. 36). She replied that this was generally a "reasonable request" and that it should be permitted. (Ex. 36). Zippilli then wrote Mobley a memo noting that it was okay to wear knee pads. (Ex. 37). MVH has never explained why this doctor's note for the kneepad accommodation was handled so properly, but Mobley had to go to CIGNA for *this other* request.

Third, although MVH claims that all these decisions needed to be made by CIGNA, Mobley's supervisors and human resources all admit that they internally reviewed, analyzed, and *rejected* his doctor's notes. One supervisor's note read: "Per Bernita [Ricks], the doctor notes do not qualify as restrictions and that Bryan can return to work in his current position at full duty expected to complete his assigned Job Description. Bryan will not be reinstated to his previous position in Surgery." (Ex. 48). Another note read: "Bryan Mobley presented a letter from his Dr….I contacted human resources for a course of action…Human Resources stated that Light Duty is not available and to send the person home until they can return to full duty without restrictions." (Ex. 46). CIGNA's input was notably absent from these decisions.

Fourth, when Mobley spoke to Ricks about an accommodation, she did not refer him to CIGNA. Instead, she said she would talk to his supervisors about his accommodations. (PDMF ¶126-27). She could not recall whether she referred him to CIGNA. (Ricks Depo. p. 15).

All these facts, taken together, demonstrate that MVH's claim that Mobley is somehow at fault for not making his request to the right company is simply misplaced.

**E.     MVH Discriminated Against Mobley by Failing to Engage in the Interactive Process**.

In this case, there is an independent, distinct cause of action that stands against MVH for failing to engage in the interactive process. (See Complaint, ¶9).  The facts demonstrate that, rather than engage in the "interactive process" to identify a reasonable accommodation or evaluate his claimed limitations; MVH simply ignored or rejected all written and oral requests. Indeed, it its Motion, MVH never disputes that it did not engage in the interactive process.

The ADA requires employers to engage in an interactive process, a duty which "is mandatory and 'requires communication and good-faith exploration of possible accommodations.'" *Keith v. County of Oakland*, 703 F.3d 918, 929 (6th Cir. 2013) (citation omitted).  The Sixth Circuit has held that "the interactive process is mandatory, and both parties have a duty to participate in good faith." *Lafata v. Church of Christ Home for the Aged*, 325 Fed. Appx. 416, 422 (6th Cir. 2009)(quoting *Nance v. Goodyear Tire & Rubber Co*., 527 F.3d 539, 556 (6th Cir. 2008)); and see *Jones v. Nissan No. Amer., Inc*., 438 Fed. Appx. 388, 401 (6th Cir. 2011) (employee entitled to judgment as a matter of law where there was no evidence that the employer took any steps to ascertain the employee's medical condition").

"An employer cannot prevail at the summary judgment stage if there is a genuine dispute as to whether the employer engaged in good faith in the interactive process."  *Lafata v. Church of Christ Home for the Aged*, 325 Fed. Appx. 416, 422 (6th Cir. 2009)(quoting *Barnett v. U.S. Air, Inc*., 228 F.3d 1105, 1116 (9th Cir. 2000)(en banc).

       F.       **Bryan Mobley's FMLA Claim is Hereby Dismissed.**

Mobley's Complaint pled a cause of action for a violation of the Family Medical Leave Act.  In essence, he averred that he was cited for a "No Call No Show" on a day for which he took FMLA leave—leave that was eventually approved by MVH as FMLA leave.  Mobley vigorously maintains that he did, in fact, provide proper notice to MVH of his absence and that he was a "No Show", but not a "No Call"—a point which MVH contests but does not appear to have ever fully investigated.

Nevertheless, Mobley agrees that discovery has revealed that the factual questions of whether he was 'No Call No Show" on the date in question or whether MVH failed to document or to investigate this fact is a separate issue from whether MVH violated the FMLA.  Therefore, Plaintiff voluntarily dismisses his FMLA cause of action.

## III.   <u>CONCLUSION</u>.

The true callousness of MVH's discriminatory treatment of Mobley is encompassed in one singular sentiment expressed by Zippilli and repeated in MVH's brief.  When Mr. Zippilii was asked why—after it had become clear that Mobley was not succeeding in the Trash position, after Mobley had presented numerous doctors' notes, and after Mobley told him that he could not physically perform the job in the time given—why he never considered moving Mobley back to Surgery or other alternatives to terminating Mobley. Zippilli declared that "**You don't reward people for not doing their jobs**."   (Zippilli 234; Doc No. ).

This one sentence demonstrates two sad facts of this case.  First, it demonstrates MVH's total deafness to Mobley's multiple, consistent pleas that he was not physically able to complete the Trash job and that he need help or a transfer back to his former job—any one of which should have triggered the interactive process.

And Zippilli's callous comment also demonstrates that MVH perceived that giving Mobley an accommodation would be—not what they were legally required to do, not what was the decent and humane thing to do—but a *reward*.

MVH's attitude is all the more shocking given that, prior to moving Mobley to the Trash position, MVH documented Mobley as <u>always</u> meeting or exceeding its expectations. He had never once been late or absent from work without excuse. He was liked by everyone he worked with. He happily worked a humble and modest job day-after-day when he could have easily gone back to receiving Social Security Disability.

Instead, MVH's supervisors chose to completely change his job because of their attitudes and misperceptions about his disability. And just sixteen days in his new position, they tossed him out just like the trash they made him clean up.

Plaintiff has demonstrated that there is a genuine issue of material fact on three distinct causes of action of disability discrimination—only two of which have been opposed. Defendant's motion for summary judgment should be denied and the case set for trial.

Dated: April 11, 2014

Respectfully submitted,

/s/ Adam R. Webber
ADAM R. WEBBER, Esq.
Bar No. 0080900
Trial attorney for Bryan A. Mobley
FALKE & DUNPHY, LLC
30 Wyoming Street
Dayton, Ohio 45409
Tel.   937.222.3000
Fax   937.222.1414
Email:  webber@ohiolawyers.cc

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 11, 2014, I electronically filed the foregoing with the Clerk of the Court by using the ECF system which will send a notice of electronic filing to the following:

Gretchen M. Treherne
BIESER, GREER & LANDIS LLP
400 PNC Center, 6 North Main Street
Dayton, Ohio 45402-1908

/s/ Adam R. Webber
_____
Adam R. Webber (#0080900)
Attorney for Plaintiff