UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| BRYAN A. MOBLEY, | : | Case No. 3:13-cv-102 |
| | : | |
| Plaintiff, | : | Judge Timothy S. Black |
| | : | |
| vs. | : | |
| | : | |
| MIAMI VALLEY HOSPITAL, INC., | : | |
| | : | |
| Defendant. | : | |

**DECISION AND ENTRY GRANTING DEFENDANT MIAMI VALLEY
HOSPITAL'S MOTION FOR SUMMARY JUDGMENT (Doc. 19)**

This civil case is before the Court on Defendant Miami Valley Hospital's Motion

for Summary Judgment. (Doc. 19). Plaintiff Bryan Mobley ("Mobley") filed a

Memorandum in Opposition to Defendant's Motion for Summary Judgment. (Doc. 26).

Defendant filed a Reply Memorandum in Support of its Motion for Summary Judgment.

(Doc. 28). Defendant's Motion is ripe for decision by the Court.

## I.  FACTS[1]

Mobley is a 56-year-old man who, at age 31, suffered a cerebral abscess and

stroke that left him with significant and permanent brain damage. As a result, Mobley

suffers from a speech and communication impairment, as well as cognitive and

neurological impairments.

---

[1] *See* the undisputed facts admitted by the parties (Doc. 27), as well as the Court's citations to the record evidence.

In 1997, Mobley began working at Good Samaritan Hospital in Dayton. In 2006, Defendant Miami Valley Hospital ("MVH") hired Mobley as a housekeeper in the environmental services department. At the times relevant to the circumstances in this case, Joseph Zippilli was Mobley's direct supervisor, Michael Benton was the manager to whom Zippilli reported, and Danny Smith, Jr. was the director of the environmental services department.

All housekeepers in the environmental services department at MVH have the same primary job description and are expected to be able to perform all positions within the department. The managers in the environmental services department have the discretion to move around employees within the department to meet the hospital's operational needs. When Mobley first began working at MVH, he was assigned to the medical imaging department. He was later assigned to clean surgery suites in the operating room which he did continuously until February 6, 2012.

While performing his assignment in the surgery suites, Mobley received favorable performance reviews and was on time and accurate every scheduled work day. In 2011, however, Mobley's supervisors began fielding complaints about Mobley's "erratic behavior" and "a noticeable change in his demeanor." Defendant contends that Mobley became confrontational in his interactions with certain co-workers, whereas Mobley contends that his co-workers became confrontational and hostile towards him. After Mobley's supervisors began receiving these complaints, they considered moving him to another position within the environmental services department.

On February 6, 2012, managers reassigned Mobley to a "patient trash" position within the department.[2]  Benton testified that one of the reasons that Mobley was removed from his position cleaning surgical suites because he was experiencing increasing conflicts with surgical staff.  Zippilli testified that he saw the transfer of Mobley to the patient trash position as "an opportunity for me to do what I thought would help Bryan."

The patient trash position required that Mobley remove trash from patient rooms located on the fourth and sixth floors of the hospital.  As a housekeeper, Mobley had previously been trained on how to empty patient trash.  Accordingly, when assigned to the patient trash position, Mobley indicated he understood the job duties.  However, from the time Mobley began the patient trash position, he consistently failed to complete his job duties each day.  Instead, Mobley usually only emptied the trash in 25% of the rooms of which he was required to service each day.

As a result of Mobley's failure to complete his job duties, Mobley's supervisors met with him on several occasions to discuss the issue.  Zippilli testified that, in his opinion, Mobley's performance issues in the patient trash position resulted from a deliberate lack of effort on Mobley's part.  Mobley, on the other hand, complained that the patient trash position was "too much" work.  However, the parties do not dispute that

---

[2] On the second day of the Trash position, Mobley was confronted by Zippilli about wearing kneepads while working.  Mobley stated that he needed them when he kneeled down to pick up trash. Mobley then brought in a note from his doctor requesting that he be permitted to wear knee pads "due to past medical history."  Zippilli sought advice from human resource representative, Bernita Ricks, about the issue, and she replied that this was a "reasonable request" and that it should be permitted as an accommodation.

other employees had no problems completing the job tasks of the patient trash position each day.

On February 14, 2012, per MVH policy, Mobley received a mandatory Step Three Corrective Action, *i.e.*, a written warning, for a no-call, no-show. On February 17, 2012, Mobley's supervisors placed Mobley on a developmental plan with a warning that he would be subject to discipline if he did not demonstrate any progress in completing his job duties.

On or about February 16, 2012, Dr. Paul Martin wrote a letter indicating his opinion that Mobley, as a result of "his current diagnosis of migraine cephalgla, Hypertension, and seizure disorder," would "not be able to fulfill the added job responsibilities" of the patient trash position. (Doc. 26-19, PAGEID 546). Dr. Martin requested that Mobley be returned "to his prior job responsibilities" cleaning operating rooms in the surgery department. (*Id*.)

On February 22, 2012, Mobley had a meeting with Zippilli, Benton, and Smith to discuss his performance issues. At that meeting, Defendant extended the developmental plan and informed Mobley that he was not going to be returned to his former job responsibilities cleaning surgery suites. (Doc. 19-40, PAGEID 358). On February 23, 2012, one day after Mobley's meeting with his supervisors to discuss his performance issues, Mobley's neurologist, Dr. Vandersluis, issued a letter stating that Mobley should

be placed on "light duty."[3]  However, just days later, on February 27, 2012, Dr.

Vandersluis withdrew his recommendation that Mobley be placed on "light duty" and

instead concurred with Dr. Martin's request that Mobley be returned to his previous job

responsibilities cleaning surgery rooms.  (Doc. 19-45, PAGEID 364).

Mobley was placed on a revised developmental plan on February 29, 2012, which

clarified some of Mobley's job duties.  Mobley did not, however, make any progress

under the developmental plan and, as a result, on March 2, 2012, Mobley received a Step

Four Corrective Action (Final Written Warning).  At that time, Defendant assigned

Mobley a trainer to demonstrate to Mobley techniques to effectively complete the job

duties in the time allotted.  Zippilli testified that the reason for assigning the trainer was

to "extend every opportunity for Bryan to be successful in this role."  Mobley, however,

did not accept the assistance of the trainer.  (Doc. 19-3, PAGEID 126, Doc. 19-6,

PAGEID 222; Doc. 19-48, PAGEID 367).

On March 7, 2012, Defendant decided to issue corrective action to terminate

Mobley's employment Mobley because of his poor job performance.  (Doc. 19-52,

PAGEID 598).  Mobley actually received the Step Five Corrective Action (Discharge)

for poor job performance on March 8, 2012, resulting in his termination from MVH.[4]

---

[3] The parties do no dispute that Defendant generally does not permit employees to work "light duty."  The only exception to this general rule is for those employees given "light duty" positions under the workers compensation program.

[4] On the morning of March 8, 2012, Plaintiff's attorney sent a letter to Defendant requesting that Mobley be afforded reasonable accommodations and that Defendant engage in the interactive process. However, by that time, Defendant had already decided to issue corrective action and terminate Mobley.

## II.  STANDARD OF REVIEW

Summary judgment is governed by Federal Rule 56.  A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact and that the movant is entitled to summary judgment as a matter of law.  Fed. R. Civ. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986).

"Summary judgment is only appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'"  *Keweenaw Bay Indian Comm. v. Rising*, 477 F.3d 881, 886 (6th Cir. 2007) (quoting Fed. R. Civ. P. 56(c)).  "Weighing of the evidence or making credibility determinations are prohibited at summary judgment  -  rather, all facts must be viewed in the light most favorable to the non-moving party."  *Id*.

Once "a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading[.]"  *Viergutz v. Lucent Technologies, Inc.*, 375 F. App'x 482, 485 (6th Cir. 2010) (citation omitted).  Instead, the party opposing summary judgment "must - by affidavits or as otherwise provided in this rule - set out specific facts showing a genuine issue for trial."  *Id*. (citation omitted).  In fact, Fed. R. Civ. P. 56(c) states that "[a] party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts

of materials in the record . . . or . . . showing that the material cited do not establish the absence . . . of a genuine dispute[.]"   Where "a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may . . .  consider the fact undisputed for purposes of the motion."  Fed. R. Civ. P. 56(e)(2).

## III. ANALYSIS

Defendant moves for summary judgment arguing that "Plaintiff's termination from his employment did not result from disability discrimination[.]"[5]  As recently noted by the Sixth Circuit, "'discrimination' under the ADA is a general term that encompasses, among other theories, disparate treatment, harassment, and failure to accommodate."  *Wells v. Chrysler Group, LLC*, --- F. App'x----, 2014 WL 1924485, *2 (6th Cir. May 15, 2014) (citations omitted).  Mobley's complaint in this case alleges circumstances involving two separate discrimination claims: (1) a disparate treatment discrimination claim arising from his reassignment to the patient trash position; and (2) a claim for failure to reasonably accommodate Mobley's disability while working in the patient trash position.  (Doc. 3, PAGEID 22).

### A.     Failure to Accommodate Claim

Under the ADA, employers are required to reasonably accommodate disabled individuals, unless the accommodation imposes an undue hardship.  42 U.S.C.

---

[5] Defendant also moves for summary judgment on Plaintiff's claim of FMLA retaliation.  In response to Defendant's Motion for Summary Judgment, however, Plaintiff appears to concede that no genuine issue of material fact exists with regard to his FMLA claim and seeks to dismiss that claim. Based on Plaintiff's abandonment of this claim, the Court **GRANTS** judgment in favor of Defendant on Plaintiff's FMLA retaliation claim.

§ 12112(b)(5)(A).  To demonstrate a *prima facie* case of "disability discrimination under the ADA for failure to accommodate, a plaintiff must show that: (1) [he or] she is disabled within the meaning of the Act; (2) [he or] she is otherwise qualified for the position, with or without reasonable accommodation; (3) [his or] her employer knew or had reason to know about her disability; (4) [he or] she requested an accommodation; and (5) the employer failed to provide the necessary accommodation."  *Myers v. Cuyahoga County, Ohio*, 182 F. App'x 510, 515 (6th Cir. 2006) (citing *DiCarlo v. Potter*, 358 F.3d 408 (6th Cir. 2004)).

Here, Defendant argues that Mobley: (1) is not disabled; (2) was not qualified for the position; and (3) never requested a reasonable accommodation related to his known limitations.  "[P]laintiff retains the ultimate burden of persuasion at all times."  *Thompson v. Henderson*, 226 F. App'x 466, 472 (6th Cir. 2007) (quoting *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444 (6th Cir. 2004)).

1.     Disability

Defendant first argues that Mobley is not disabled.  Note, however, that "[o]n September 25, 2008, Congress amended the ADA to reject the narrow interpretation of what constitutes a disability[.]"  *Robbins v. Saturn Corp.*, 532 F. App'x 623, 628 (6th Cir. 2013) (citations omitted).  "The Americans with Disabilities Act Amendments Act of 2008 ("ADAAA"), effective January 1, 2009, provides that the term 'disability' should be construed broadly."  *Core v. Champaign Cnty. Bd. of Cnty. Commissioners*, No. 3:11-cv-166, 2012 WL 4959444, *4 (S.D. Ohio Oct. 17, 2012) (citing 42 U.S.C. § 12102(4)A;

*see also Evola v. City of Franklin, Tenn.*, --- F. Supp.2d ---, 2014 WL 1706231, *8 (M.D. Tenn. Apr. 29, 2014).

Under the ADAAA, a person is disabled if that individual suffers from "a physical or mental impairment that substantially limits one or more major life activities[,]" has "a record of such an impairment" or is "regarded as having such an impairment[.]" 42 U.S.C. § 12102(1). The phrase "[p]hysical or mental impairment means" is defined as:

> (1) Any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, immune, circulatory, hemic, lymphatic, skin, and endocrine; or
>
> (2) Any mental or psychological disorder, such as an intellectual disability (formerly termed "mental retardation"), organic brain syndrome, emotional or mental illness, and specific learning disabilities.

29 C.F.R. § 1630.2(h). "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).

The Code of Federal Regulations states that:

> An impairment is a disability…if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting. 29 C.F.R. § 1630.2(j)(1)(ii).

Further, "[t]he term 'substantially limits' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA" and the substantially limits standard "is not meant to be a demanding standard." 29 C.F.R. § 1630.2(j)(1)(i).

Here, Mobley presents expert testimony demonstrating that he suffers from a number of physical, mental and neurological impairments, such as a seizure disorder, hypertension, migraine cephalgia, a liver condition, dysarthria and apraxia. (Doc. 26-1, PAGEID 442). According to Dr. Paul Martin, Mobley's conditions cause, among other difficulties, a substantial speech and communication impairment, as well as confusion, impaired cognition, and altered mental status. (*Id*.) Dr. Martin concludes that, based on Mobley's physical, mental and neurological impairments, Mobley is substantially limited in his ability to speak, think and communicate. (*Id*.) Based on the foregoing, at the least, an issue of fact remains as to whether, as compared to most people, Mobley's ability to speak, think and communicate is substantially limited as a result of the physical, mental and neurological impairments documented by Dr. Martin.

2.    Request for Reasonable Accommodation

Next, Defendant argues that Mobley's claim must fail because Mobley never requested a reasonable accommodation. Mobley asserts that he ultimately requested two reasonable accommodations: (1) to be returned to the Surgery position; or (2) to "restructure" the patient trash position performed by Mobley into a light duty position.

Under the ADA, plaintiffs bear "'the initial burden of proposing an accommodation and showing that that accommodation is objectively reasonable.'" *Steward v. New Chrysler*, 415 F. App'x 632, 642 (6th Cir. 2011) (citing *Johnson v. Cleveland City Sch. Dist.*, 344 F. App'x 104 (6th Cir. 2009); *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862 (6th Cir. 2007)). "In order for an accommodation to be reasonable, it should be necessary in light of the plaintiff's known physical limitations." *Johnson*, 344 F. App'x at 111 (citing *Nance v. Goodyear Tire & Rubber Co.*, 527 F.3d 539 (6th Cir.2008); *Jackson v. City of Chicago*, 414 F.3d 806 (7th Cir. 2005)). Summary judgment is proper if a plaintiff fails to show that requested accommodations are reasonable. *Cassidy v. Detroit Edison Co.*, 138 F.3d 629, 635 (6th Cir. 1998).

The request to "restructure" the patient trash position by permanently allowing Mobley to perform a lighter workload is not a reasonable accommodation. Mobley suggests that such a request is reasonable because Defendant "makes light duty available to injured employees[.]" (Doc. 26, PAGEID 435). However, Mobley cites no authority supporting the assertion that permanently restructuring a position to a light duty position has ever been considered a reasonable accommodation. In fact, the Sixth Circuit has specifically rejected Mobley's contention. S*ee Kempter v. Mich. Bell Tel. Co.*, 534 F. App'x 487, 492 (6th Cir. 2013) (concluding that "[e]mployers are not required to convert 'temporary light-duty positions for recuperating employees' into permanent positions"); *see also Younger v. Dep't of Veterans Affairs*, 89 F. App'x 241, 244 (Fed. Cir. 2004) (concluding that "[a]ssignment to permanent light duty cannot constitute a reasonable

accommodation, because an agency is not obligated to assign him to limited-duty tasks that do not constitute a complete and separate position"). Accordingly, Mobley's request to "restructure" the Trash Position by reducing the workload is not a reasonable accommodation request. Further, the request for light duty was rescinded by Mobley's doctor within days of the request.

Mobley's request to be reassigned back to his former position of cleaning surgery suites, however, may be a reasonable accommodation under certain circumstances. 42 U.S.C. § 12111(9)(B) (stating that "[t]he term 'reasonable accommodation' may include…reassignment to a vacant position"). However, as noted above, "[i]n order for an accommodation to be reasonable, it should be necessary in light of the plaintiff's known physical limitations." *Johnson*, 344 F. App'x at 111 (citing *Nance v. Goodyear Tire & Rubber Co.*, 527 F.3d 539 (6th Cir.2008)).

The language set forth in 29 C.F.R. § 1630.2(o), which provides the definition of reasonable accommodation, "suggests that any accommodation should logically be linked to enabling the individual with a disability to overcome limitations or barriers he faces due to the disability." *Wohler v. Toledo Stamping & Mfg. Co.*, 125 F.3d 856, 1997 WL 603422, *6 (6th Cir. Sept. 30, 1997); *see also Obnamia v. Shinseki*, No. 2:12-cv-58, 2013 WL 5408267, *4 (S.D. Ohio Sept. 25, 2013) (stating that "[i]n satisfying her duty to propose a reasonable accommodation to her employer, a plaintiff must request the accommodation and provide either actual or constructive notice that the request is linked to a disability").

In other words, "[a]t the least, the request must explain how the accommodation requested is linked to some disability." *Reed v. LePage Bakeries, Inc.*, 244 F.3d 254, 261 (1st Cir. 2001); *see also Freadman v. Metro. Prop. & Cas. Ins. Co.*, 484 F.3d 91, 103 (1st Cir. 2007) (stating that, in making an accommodation request, the employee "'must explain how the accommodation requested is linked to some disability'"); *see also Alsept v. Honda of Am. Mfg., Inc.*, No. 3:11-cv-395, 2013 WL 2417980, *8 (S.D. Ohio Jun. 3, 2013) (stating that, "[a]t the least, the request must explain how the accommodation requested is linked to some disability").

Here, while Mobley points to evidence that he has impairments (*i.e.*, a seizure disorder, hypertension, migraine cephalgia, a liver condition, dysarthria and apraxia), that his impairments limit major life activities (*i.e.*, his ability to speak, think and communicate), Mobley points to nothing suggesting what limitations result from his impairments. In other words, there is no evidence that the limitations resulting from Mobley's disability had any impact on his failure to complete the tasks of the position. Mobley himself admitted that his disability did not impact his ability to perform the essential functions of the patient trash position. (Doc. 19-2, PAGEID 111).

Simply put, what limitations necessitated an accommodation so that Mobley could perform the essential functions of the patient trash task? Mobley points to nothing explaining how a return to cleaning surgery suits accommodated any limitations arising from his impairments. Accordingly, the Court concludes that no genuine issue of material fact remains, and that Mobley fails to evidence that his requested

accommodation is necessary or reasonable.  Thus, summary judgment is appropriate in favor of Defendant on Mobley's failure to accommodate claim.

### B.    Engaging in the Interactive Process

Next, Mobley contends that Defendant discriminated against him by failing to engage in the interactive process.  Pursuant to 29 C.F.R. § 1630.2(o)(3), "[t]o determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation."  This interactive "process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations."  *Id*.  This process "'requires communication and good-faith exploration of possible accommodations.'"  *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 871 (6th Cir. 2007) (quoting *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105 (9th Cir. 2000)).  Further, "the interactive process is mandatory, and both parties have a duty to participate in good faith."  *Id*.  (citations omitted).

In asserting that Defendant failed to engage in the interactive process in good-faith, Mobley argues the Defendant "simply ignored or rejected all written and oral requests."  (Doc. 26, PAGEID 437).  Mobley does not provide any record citation to support his assertions in this regard.  Certainly, Defendant rejected Mobley's requested accommodations for light duty and to be transferred to the Surgery position.  However, as set forth above, the evidence presented does not support a conclusion that those requested

accommodations were reasonable. The law is clear that <u>Mobley is not entitled to the accommodation of his choosing</u>. *McKane v. UBS Fin. Services, Inc.*, 363 F. App'x 679, 681 (11th Cir. 2010) (stating that "[a]n employee with a disability is not entitled to the accommodation of his choice, but only to a reasonable accommodation"). Instead, to prevail on this claim, Mobley must demonstrate "the availability of a reasonable accommodation." *Id.* at 682.

Insofar as Mobley suggests that his requests for accommodation were outright ignored, the record simply does not support such a conclusion. Mobley requested the ability to wear knee pads while performing his work, which Defendant granted. On February 22, 2012, after Dr. Martin opined that Mobley should be returned to the surgery position, Defendant met with Mobley "to inform Bryan of [the] Human Resources decision regarding Bryan's return to his former position[,]" *i.e.*, that that request was denied. (Doc. 19-40, PAGEID 358). While Defendant informed Mobley that his requested accommodation would not be granted, Defendant allowed Mobley to address his concerns during that meeting and Defendant also gave Mobley an additional day to meet his job objectives. (*Id.*) While Mobley continued to not meet his objectives thereafter, Defendant continued to give him until March 2, 2012 before progressing to the next step in the disciplinary process. (Doc. 27, PAGEID 576-578).

At that time, Defendant continued in its attempts to assist Mobley in his job performance by assigning an individual to provide additional training and to demonstrate to Mobley techniques to effectively complete the job duties in the time allotted. (Doc.

19-48, PAGEID 367). Mobley declined the training opportunity. (Doc. 19-6, PAGEID 221-222). Based on the foregoing, the record evidence eliminates Mobley's contentions that his requests were ignored and that Defendant failed to engage in the interactive process.

Insofar as Mobley suggests that his requests were ignored because Defendant did not directly contact his physicians, such an argument has no merit. *See Kleiber*, 485 F.3d 862, 871 (6th Cir. 2007) (stating that the interactive process "is designed to encourage direct participation on behalf of both the employee and the employer" rather than through proxies or other representatives). The foregoing evidence demonstrates that Defendant interacted directly with Mobley throughout the process. In addition, Mobley points to nothing suggesting that Defendant's actions were in bad faith or that Defendant was responsible for any breakdown in the process.

Accordingly, summary judgment is appropriate on Mobley's claim that Defendant discriminated against Mobley by failing to engage in the interactive process. The evidence does not support a failure to engage with Mobley, and further, Mobley fails in meeting his burden to evidence the availability of a reasonable accommodation.

## C. Disparate Treatment

Finally, Mobley claims that Defendant discriminated against him on the basis of his disability when Defendant reassigned him from cleaning surgery suites to the task of emptying patient trash. Mobley argues that direct evidence supports his claim that Defendant transferred him to the patient trash position because of his disability. "Direct

evidence of discrimination is unambiguous evidence that proves the existence of discriminatory animus without requiring any inferences." *Choices in Cmty. Living, Inc. v. Petkus*, 517 F. App'x 501, 506 n3 (6th Cir. 2013) (citing *Wharton v. Gorman–Rupp Co.*, 309 F. App'x 990 (6th Cir. 2009)).

Regardless of whether Mobley seeks to demonstrate disparate treatment with direct evidence or by using the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), Mobley "must demonstrate an adverse employment action[.]" *Policastro v. Nw. Airlines, Inc.*, 297 F.3d 535, 539 n1 (6th Cir. 2002) (stating that "whether she proceeds on the basis of direct evidence or circumstantial evidence, she must demonstrate an adverse employment action"); *Rushton v. City of Warren*, 90 F. App'x 912, 916 n1 (6th Cir. 2004); *see also Grimsley v. Marshalls of MA, Inc.*, 284 F. App'x 604, 608 (11th Cir. 2008) (stating that "plaintiff must…show that an adverse employment action was taken against him 'regardless of whether he is relying on direct evidence of discrimination or employing the burden-shifting approach…for cases in which only circumstantial evidence is available'") (citing *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208 (11th Cir. 2001)).

In this regard, Mobley suggests that a reassignment from cleaning surgery suites to emptying patient trash amounts to an adverse employment action *because Mobley considered it a demotion*. (Doc. 27, PAGEID 584). Defendant, on the other hand, argues that "[t]he only person who considered [the] transfer…a demotion was Mobley himself." (Doc. 28, PAGEID 591-592). Certainly, the parties agree that all housekeepers working

for Defendant, whether cleaning the surgery suites or emptying patient trash, have the same primary job description and are expected to be able to perform all positions within the environmental services department. (Doc. 27, PAGEID 566).

An adverse employment action is "a 'materially adverse change in the terms and conditions of a plaintiff's employment.'" *Deleon v. Kalamazoo Cnty. Rd. Comm'n*, 739 F.3d 914, 918 (6th Cir. 2014) (citations omitted). "A 'mere inconvenience or an alteration of job responsibilities' is not enough to constitute an adverse employment action." *Id.* (citations omitted). Generally, "reassignments without salary or work hour changes do not ordinarily constitute adverse employment decisions in employment discrimination claims." *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 885 (6th Cir. 1996) (citation omitted). However, reassignments resulting in "a 'less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation'" may constitute an adverse employment action. *Deleon*, 739 F.3d at 918 (citations omitted). "[A]n employee's transfer may constitute a materially adverse employment action, even in the absence of a demotion or pay decrease, so long as the particular circumstances present give rise to some level of objective intolerability." *Id.* at 919.

Mobley's Memorandum in Opposition asserts that he "considered the move to be a demotion and an increase in his job duties." (Doc. 26, PAGEID 413). The Memorandum cites no portion of the record wherein Mobley actually expressed the opinion that the reassignment was a demotion. Mobley did testify as to his belief that "[t]he new job was

more work than [his] prior job[,]" and that the job was faster paced, akin to "a race horse." (Doc. 26-9, PAGEID 518). Mobley admits, however, that other employees had no problems completing the job tasks each day. (Doc. 27, PAGEID 573-574).

Certainly, based on the foregoing, the record supports a conclusion that Mobley preferred cleaning the surgery suites. However, "[a]n employee's subjective impressions as to the desirability of one position over another *are not relevant*." *Policastro*, 297 F.3d at 539 (emphasis added) (citations omitted). In fact, the Supreme Court holds that "[w]hether a particular reassignment is materially adverse depends upon the circumstances of the particular case, and 'should be judged from the perspective of a reasonable person in the plaintiff's position[.]'" *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 71 (2006) (citation omitted); *see also Deleon*, 739 F.3d at 919.

Here, aside from Mobley's subjective opinions and preferences, there is no evidence in the record that could support an objective conclusion that the patient trash position was any less desirable than the surgery suite cleaning position. There is certainly no evidence that the position was <u>objectively intolerable</u>.[6] While Mobley attempts to portray the trash position as a constructive demotion by pointing to the testimony of Joseph Zippilli, and suggesting that the surgery cleaning position "had a reputation as being one of the better housekeeping jobs" (Doc. 27, PAGEID 584), Zippilli's testimony referenced by Mobley simply does not support Mobley's contention:

---

[6] Mobley does reference the fact that a co-worker who learned of the reassignment believed that the transfer evidenced that Defendant was "getting ready to fire [Plaintiff]." This alleged statement by a co-worker provides no basis upon which the Court can conclude that the patient trash position was objectively intolerable.

Q Are you aware that your employees generally view some of the 32 jobs that you oversee as being -- some being more favorable than others?

A I'd be surprised if there wasn't some opinions like that, sure.

Q Ok. Are -- Bryan's job, the former job, the Surgery OR 1, did that have a reputation as being a good job or a -- one of the better jobs in the list?

A I would -- some people would think that -- sure.

Q What about the Patient Trash 2 position, what reputation did that position have?

A Same thing. Some people liked it, some people didn't.

Q And did you ever have any ask to do that job?

A Yes.

Q And you've had that job open for bids and people have bid for it?

A No. But I've had people assigned to the job who liked the job.

Q Did you ever open one of those positions for bids?

A Yes, we do it all the time, whenever they're empty.

Q But you never had anybody on another one of your 32 jobs bid for that job?

A I have.

Q I'm sorry, maybe I misheard you then.

A Well, it's not a static job. I mean -- over -- five years, the job has opened and people have applied for it.

Q That were working on other –

A Yes.

Q  -- jobs --

A  Sure.

Q  -- under your domain?

A  Yes.

Q  Have you ever heard anybody refer to it as being a job that was a punitive job?

A  Bryan.

Q  Anybody else?

A  No.

Q  Ever heard anybody tell you that they didn't want to be assigned to that job?

A  Just Bryan.

(Doc. 26-7, PAGEID 494).

Where, as here, an objective inquiry is required to determine whether an lateral reassignment constitutes an adverse employment action, a genuine issue of material fact does <u>not</u> arise based solely and entirely on Mobley's personal preference and his opinion that the patient trash assignment "was more work."  Accordingly, the Court concludes that there is an absence of evidence upon which a reasonable jury could find that Mobley's reassignment to the patient trash position was an adverse employment action. As a result, the Court grants summary judgment in favor of Defendant on Mobley's disparate treatment claim.

## IV. CONCLUSION

Based on the foregoing, Defendant's Motion for Summary Judgment (Doc. 19) is **GRANTED**. The Clerk shall enter judgment accordingly, and this case shall be terminated on the docket of this Court.

**IT IS SO ORDERED.**

Date: 6/9/14 _____          _____/s/ Timothy S. Black_____
                                      Timothy S. Black
                                      United States District Judge